**HELENE CURTIS INDUSTRIES, Inc., et al.**

v.

**SALES AFFILIATES, Inc.**

**GILLETTE CO. et al.**

v.

**SALES AFFILIATES, Inc.**

**SALES AFFILIATES, Inc., et al.**

v.

**LAYDEN.**

**SALES AFFILIATES, Inc., et al.**

v.

**SKILLERN & SONS, Inc., et al.**

United States District Court
S. D. New York.
April 30, 1954.

493

Kenyon & Kenyon, New York City, Theodore S. Kenyon, Malvin R. Mandelbaum, New York City, Maurice S. Cayne, Chicago, Ill., of counsel, for plaintiff Helene Curtis Industries, Inc., Helene Curtis Sales, Inc. and C. V. Layden, plaintiff-intervener.

Henry R. Ashton, New York City, Edgar H. Kend, Boston, Mass., Harry R. Pugh, Jr., Rynn Berry, New York City, and Martin Kirkpatrick, Boston, Mass., of counsel, for plaintiff Gillette Co.

Hawkins, Delafield & Wood, New York City, Clarence Fried, New York City, of counsel, for plaintiffs-interveners Skillern & Sons, Inc., and Walgreen Drug Co. of Texas.

Morgan, Finnegan & Durham, New York City, George B. Finnegan, Jr., William D. Denson and Jerome G. Lee, New York City, of counsel, for defendant Sales Affiliates, Inc.

IRVING R. KAUFMAN, District Judge.

The Court has before it for review the Report of a Special Master which

(1) holds U. S. Patent No. 2,577,710 invalid;

(2) dismisses all counterclaims brought by defendant, Sales Affiliates, Inc., for infringement and damages; and

(3) dismisses two consolidated infringement actions originally brought by the defendant in Texas.

In issue here, in four actions which were consolidated for trial,[1] is the validity and infringement of the McDonough U. S. Patent, issued on December 4, 1951, to Procter and Gamble as mortgagee of Sales Affiliates, Inc., the assignee of the applicant-inventor, Everett G. McDonough. The McDonough patent is concerned with permanent waving compositions which employ as a waving agent any one of a broad class of chemical compounds known as mercaptans.

The litigious history of the patent since application for it was first made on June 16, 1941, is indicated in the Master's Report and in a former opinion of this Court.[2]

## I. Objections to Master's Report

Plaintiffs filed nine objections to the Master's Report; defendant filed 371. Ample time was given the parties to brief their contentions. In addition to the voluminous briefs submitted, a copy of the Master's Report, with annotated reference to the objections and the stenographic minutes, was also submitted to this Court. Copies of the voluminous briefs submitted to the Master, totalling nearly 1000 pages, were also carefully examined by this Court. A date for oral argument on the objections was fixed and counsel were given ample time to present to this Court their respective positions.

## II. Proceedings Before the Master

Before passing to a consideration of the extensive objections made to the Master's Report, it is appropriate to note the magnitude of the trial before the Master.

"On July 2, 1952, informal preliminary statements and outlines of proof were made by counsel. * * With customary optimism, it was anticipated that the trial would be completed by the end of September. However, the New York depositions, which were taken before the Master, consumed over two months, filling more than 2,000 pages of transcript, most of which was subsequently offered at the trial. The trial got under way on October 21, and continued well into January, 1953. During its course more than twenty witnesses gave more than 4,000 pages of testimony, all in addition to the depositions of absent as well as present witnesses. Almost a thousand exhibits were marked for identification or offered in evidence" (out of a total of 8,455 documents which had been produced on demand of one party or another). "[T]he exhibits * * * themselves [added] up to several thousand pages of evidence. The briefs of the parties totaled almost a thousand pages. It can be said that rarely, if ever, has a patent case been more thoroughly presented by way of testimony and documentation, and so exhaustively argued." (Page 7 of Master's Report.)

The Master, a former Federal Judge, was eminently qualified to deal with a case of such complexity. The length of his report and the detailed and meticulous consideration of each point presented show the extraordinary thoroughness with which he dealt with a complex problem. Many of the factual issues are of a scientific nature and a determination of these issues required the digesting of literally thousands of pages of documentary evidence. Often, a careful search through hundreds of pages of laboratory records was necessary—a

1. For convenience, Sales Affiliates, Inc. is herein referred to as the defendant; those parties who oppose the patent in suit are referred to as plaintiffs.

2. Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., D.C.S.D.N.Y.1952, 105 F. Supp. 886, affirmed 2 Cir., 1952, 199 F.2d 732.

practice followed by this Court as well in the instant proceeding.

■ Before reviewing a decision which rests on such an extensive investigation, it should be pointed out that the Federal Rules of Civil Procedure instruct us that the Master's findings of fact are to be accepted unless clearly erroneous. Rule 53(e) (2), 28 U.S.C.A. This same principle applies to the findings of a district court upon an appeal. U. S. v. Village of Highland Falls, 2 Cir., 1946 154 F.2d 224, 227, certiorari denied Volkringer v. United States, 1946, 329 U.S. 720, 67 S.Ct. 54, 91 L.Ed. 624.

The language of the Court of Appeals for the Seventh Circuit in Santa Cruz Oil Corporation v. Allbright-Nell Co., 7 Cir., 1940, 115 F.2d 604, 607–608 is appropriate here:

"Much labor and thought was given to the matter by an experienced Master, as is amply disclosed by a study of the first report rendered by him. He heard, saw and observed the witnesses and was in a better position to judge of their credibility and the weight to be given their testimony than either the District Court or this court, neither of which has had such an opportunity. To set aside his findings 'unless clearly erroneous' is not only contrary to the rule quoted and the accepted practice, but amounts to a trial de novo by the reviewing court with no assurance that any better or more accurate results could be achieved."[3]

■ It is of course true that in judging the Master's findings, the district court must consider the basis of the particular findings under consideration. Thus, findings based on oral testimony where credibility is involved, are entitled to great weight, since the Master (like a trial court) had the chance to see and observe those who testified. On the other hand

"any presumption in favor of the Master is of slight importance relative to inferences, deductions, or conclusions, which the Master draws from uncontradicted, admitted, or stipulated facts and which the trial or appellate court is equally capable of making." 5 Moore's Federal Practice, 2d Ed. 1951, pp. 2981, 2985 et seq.

The Master's findings of fact in the case at bar, drawn in large part from extensive and controverted testimony by many experts in the permanent waving field, arrive for review here, at least as to those parts based upon oral testimony, armored with a strong presumption of validity.[4]

### III. Form of the Report [5]

■ Sales Affiliates' opening objection to the Report of the Special Master

---

3. The Supreme Court, in a recent patent case, had occasion to apply the similar provisions of Rule 52 concerning the findings by a trial court and stated: "Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides in part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' To no type of case is this last clause more appropriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations." Graver Tank & Mfg. Co. v. Linde Air Products Co., 1949, 336 U.S. 271, 274, 69 S.Ct. 535, 537, 93 L.Ed. 672.

4. Criticism may be leveled at the Master's Report, as well as at this Opinion, for deciding issues which became unnecessary to decide by reason of previous findings. The purpose, of course, is to prevent a long and costly retrial if a reviewing court disagrees with a specific finding, for even if there might be disagreement with the lower court over one or several findings the reviewing court might still be in agreement with other findings sufficient to sustain the ultimate conclusions.

5. Sales Affiliates' objections to the Master's Report were divided into six categories—A through F. Section A was an objection to the Form of the Report. Section B was directed toward the Master's failure to set a day for argument following the submission of briefs. This

is that he failed to comply with the order of reference and with the provisions of Rule 53(e)(1) of the Federal Rules of Civil Procedure, because he did not separately list and number his findings of fact and conclusions of law, but instead incorporated his findings and conclusions in his Report. This contention is without merit.

Rule 53(e)(1), referred to by Sales Affiliates, specifically states that if the Master is required to make findings of fact and conclusions of law, "he shall set them forth in the report." It is not essential that findings and conclusions be separately stated and numbered. Under Rule 52(a), a district court's findings and conclusions may be presented in an opinion. Similarly, the findings and conclusions of a Master may be presented in the form of an opinion, as in the present case, providing his findings and conclusions have "sufficient form and content." 5 Moore's Federal Practice, supra, page 2980. The Special Master's findings and conclusions are clearly set forth in his Report and that is all that is required. There is more interest in substance than in form.

## IV. The Invention Claimed [6]

█ Of the extensive substantive objections made by defendant to the Master's report, I shall deal first with the questions of criticality and the invention claimed. Defendant does not posit invention on the broad generic discovery of mercaptan waving lotions,[7] for it is clear that McDonough was not the first to discover the usefulness of mercaptans as permanent waving agents. Prior disclosures by others of the usefulness of a species of mercaptans for waving bars any claim by defendant to a generic discovery. Metals Recovery Co. v. Anaconda Copper Mining Co., 9 Cir., 1929, 31 F.2d 100; In re Steenbock, 1936, 83 F.2d 912, 23 C.C.P.A.,Patents, 1244; Application of Kyrides, 1947, 159 F.2d 1019, 34 C.C.P.A.,Patents, 920.

Defendant claims as invention, however, the discovery of certain critical limits for mercaptan waving—points at which there occurs some result differing in *kind,* not merely in degree, from the results achieved by the prior art. Kwik Set, Inc. v. Welch Grape Juice Co., 2 Cir., 1936, 86 F.2d 945; 2 Walker on Patents, p. 755. Specifically, defendant claims a mercaptan waving lotion falling within the asserted critical limits.

█ Plaintiff's initial attack on the patent is based on McDonough's failure to disclose these critical limitations in his application and in his patent. Such disclosure is essential for patent validity. 35 U.S.C.A. § 112. Defendant urges that the critical limits which comprise the invention need not necessarily be stated in the claims, so long as they are disclosed in the specification. But the validity of each claim depends on whether it covers a "patentable advance over the prior art which the specifications disclose". Addressograph-Multigraph Corp.

objection, however, overlooked a meeting on May 14, 1953, at which agreement was reached between all parties on this point. Futhermore, such an objection seems insubstantial in view of the extensive arguments that have been heard. Section C contains 297 objections to the Master's Report. At the beginning of each part of this Opinion, infra, the Section C objections relevant to that part are noted. Section D contains 70 objections based on what the Master failed to find. Sections E and F are treated at pages 509 and 513 respectively, infra.

6. Objections Covered: 7–34.
 Objection 1 is insubstantial. Objections 2–4 deal with the Master's general statements as to the permanent waving art. The objections are overruled. Objection 5 deals with the Master's ruling on the method claims (claims 5 and 6) and this ruling is affirmed. Defendant's method in claims 5 and 6 is clearly not new itself; the only *asserted* novelty, as the Master found, is in the new waving lotion. Hence, the patentability of the method claims depends on whether the waving lotion is patentable. Objection 6 is dealt with in footnote 30, infra.

7. Hearing on Confirmation of Master's Report, p. 14.

v. Staudt, 2 Cir., 1942, 124 F.2d 672, 675; See also Walker, supra, at p. 770. This means, as the Master found, that the limits of the claims must conform to the occurrence of some physical phenomenon denoting a difference in kind from what was achieved before, since such criticality alone would distinguish the claimed compositions from those known to the prior art.

■■ I am convinced, upon an examination of McDonough's original application and his patent,[8] that the Master correctly found that neither the original application nor the patent discloses or teaches that any particular factor—be it pH, concentration, molecular weight, or kind of base—is critical in mercaptan permanent waving (Master's Report, p. 21).[9] Furthermore, an examination of the specification convinces me that at the time of original application McDonough was asserting his invention to be *not* the discovery of critical limitations but the broader discovery of mercaptans as waving agents. The Master was correct in finding that the defendant cannot now rest its claim on an entirely different conception of invention, *i. e.* criticality, when such an invention was never disclosed.

## V. Criticality in Fact[10]

Even assuming, however that McDonough's limits were disclosed as critical, plaintiffs effectively proved they were not critical in fact. Defendant con-

---

8. Plaintiffs' Exhibits 103, 104.

9. Defendant urges that the application, as originally filed in 1941, claimed *both* the discovery of a mercaptan waving lotion and the discovery of critical limits— *i. e.* of a mercaptan waving lotion within certain critical limits. (Hearing on Confirmation of Master's Report, pp. 12–13). The Master, at pages 21–28 of his Report, discusses each of the factors asserted to be critical. His analysis of the original application and the patent, as failing to disclose such claimed criticality, is clearly correct. For example, disclosure as to pH—which was by far the most important factor in defendant's case—included the following language in the specification:

> "I have discovered that all of the materials mentioned above function satisfactorily as hair waving agents when used in solutions. The concentration is usually less than 15%. I have found that the mercaptans are especially effective when the pH range is from 7.0 to 10.0, the preferred pH being about 9.2."

Further on, McDonough notes:

> "This pH range is particularly critical when the waving agent is used for that type of waving employing a chemical setting agent, as in the so-called 'cold waving' method, since in that system the necessary requirement of speed without hair destruction demands a high concentration of the waving agent in the waving solution. If the pH value is not high enough slow waving action will result and if too high the hair will be destroyed or badly damaged. While with sulfite a shorter waving time may require a pH of 10 or above, with these more powerful waving agents, the use of pH's higher than 9.5 must be watched very carefully for with pH of 10 or above, hair destruction or injury may occur before a satisfactory wave is obtained."

Except for a later remark as to "optimum pH" there is no further reference to pH until the claims. As the Master concluded:

> "It is plain that there is no disclosure of criticality in the above quoted language. McDonough teaches only that mercaptans are most effective in the pH range from 7 to 10, and that solutions above pH 9.5 must be watched carefully; he doesn't say, nor does his language imply, that the pH values of 7 and 10 are points beyond which successful permanent waving cannot be obtained, or that any significant physical phenomena occur at pH 7 and 10. True, he did use the language 'particularly critical' with respect to the pH range 7 to 10 in cold waving. But, he explained this by saying that since cold waving requires a high concentration of waving agent in the solution to satisfy the requirement of speed, too high a pH under those conditions *may* damage or destroy the hair. Defendant would have us read this language as meaning that above pH 10 hair injury must occur. However, a patentee's language cannot be rewritten to satisfy the demands of litigation; he is bound by the ordinary meaning of the words that he uses." (Master's Report, pp. 22–23.)

10. Objections Covered: 34–59.

tended, for example, that a range of pH from 7 to 10 was technically critical since at above pH 10 complete waving could not be achieved before the hair was damaged. McDonough's claim of a pH from 7 to 9.5, within the asserted technically critical range, was said to mark the boundary of practical, commercial criticality. But the Master found that tests made by Brown demonstrated that a permanent wave can be obtained above pH 9.5 and even above pH 10, and that the waves so obtained differed only in *degree* from those obtained when using pH solutions within the limits of the claims or the specification. Brown's tests also contradicted any notion of patentable criticality of such other factors as alkaline agents, concentration, or molecular weight, at least for cold waving by the direct application method and for hot waving.

■ Defendant attacks Brown's tests on several grounds. It is first urged that Brown's test did not carry waving to maximum tightness, and that therefore these tests do not disprove defendant's assertion that above pH 10 maximum curl tightness cannot be achieved before damage results. Regardless of the validity of this argument, however,[11] the Master found that curl values obtained above pH 10 differ only in degree from those achieved within the patent limits. Such differences may not properly be considered critical differences in kind. Cf. Edison Electric Light Co. v. U. S. Electric Lighting Co., 2 Cir., 1892, 52 F. 300, 308.

■ Defendant further asserts that the Master erred in determining "differences in kind," by measuring McDonough's invention against the art of 1952–53, rather than against the art of 1941. It is true that criticality is determined by whether the limits claimed produce a difference in kind from results achieved by the *prior* art, 35 U.S.C.A., § 103. Thus, criticality should be determined here by whether McDonough's limits produced a new result in 1941.

■ I conclude that the Master's conclusions as to criticality should be sustained. The Master found as a fact that the limits claimed were not critical —in other words, he found that at any time, including 1941,[12] waving outside the alleged critical limits did not differ in kind, but only in degree, from waving within McDonough's limits. For example, in concluding that pH 7 is not a critical lower limit, the Master noted that waving speeds *in 1941*—as today— varied considerably depending on the method used (Master's Report, p. 30). In judging the validity of defendant's "test tube immersion methods" for proving criticality, the Master held that such testing methods were not representative of present commercial practices, *or even of the circulating method,* which was the principal method used in 1941 (Master's Report, p. 31). Furthermore, the Master found that McDonough's own test records including his pre-1941 test records, indicated that his limits were not critical as claimed.[13] In passing, it is to

11. Defendant is by no means convincing in its contention that Brown failed to carry his waving to maximum tightness. Brown's testing range, measured on a scale from 1–6 (with 6 as over-processed), seems to cover the full range of possible waving without damage, and defendant's assertion that testimony at R. 3092, 3094 indicates to the contrary is unconvincing.

12. The Master points out that a mercaptan waving solution was patented by Speakman over a year before McDonough's application date. U. S. Patent No. 2,201,929 was issued to Speakman May 21, 1940. Master's Report, p. 16.

13. e. g. Record: 559–60; 573–4; 603–4. The Master, in concluding that McDonough's early test records disproved his claims as to criticality, relied in part on a 1940 test record of one of McDonough's assistants, Miss McGoldrick. This test record reported a satisfactory wave at above pH 10 (R. 614–16). Defendant urges that McGoldrick erroneously reported a pH above 10 when, in fact, the pH was 9.63 (R. 5971) and that this record is no basis for the Master's conclusion. But the Master may not have accepted McDonough's testimony that the pH of the solution was reported erroneously by McGoldrick, in view of the fact

be noted that defendant did not establish that any material difference existed between Brown's tests and the waving art of 1941. Absent such a difference, Brown's tests alone would not be an improper basis for the Master's conclusion that no criticality in fact existed. It is noted also that at the trial defendant used test by McDonough, made not in 1941 but only a few weeks before their presentation, in its own attempt to prove criticality.[14]

It is clear that the Master found that the limits claimed by McDonough were not critical whether measured against the 1941 art or the art of any subsequent date.

### VI. Pre-Filing Invention Date[15]

Defendant next attacks the Master's finding that McDonough is not entitled to any pre-filing date of invention.

"It is an accepted principle of patent law," as the Master states, "that an inventor who seeks to carry back his invention date must do so by clear and convincing evidence." See United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 2 Cir., 1935, 77 F.2d 263. To show a right to a pre-filing date of invention here, defendant must clearly prove that at the time claimed for invention, McDonough had at least some conception of the critical limits claimed to constitute the invention.

The Master's conclusion that defendant did not produce such "clear and convincing evidence" rested in large part on an analysis of McDonough's experimental records and memoranda as well as on testimony by McDonough himself explaining these records. The conclusion, grounded in the main on the examination of documents, is not so presumptively correct as in the instance where it is based entirely upon the testimony of live witnesses, seen and heard. Nevertheless, I am convinced that the Master accurately evaluated the evidence produced and that these documents show that McDonough did not have a satisfactory waving lotion until he had completed his final series of experiments which started in April 1941.

Of special significance in support of this conclusion are the Master's findings, fully supported by the records and testimony, that in February 1940, McGoldrick, working under McDonough, was testing mercaptans and using in two of her testing solutions sodium hydroxide, one of the very strongest bases. Opposite one of these solutions, she recorded "No apparent damage to hair."[16] These tests certainly indicate, as the Master found, that McDonough had not then determined that weak bases were critical. Later, in May, 1940, McGoldrick was experimenting with the effect of changes in pH on the effectiveness of waving solutions. It hardly seems likely, in view of these tests, that McDonough had at that time determined the critical pH limits he now claims. Furthermore, McDonough's laboratory notebook, beginning on April 11, 1941, records a series of experiments the purpose of which was "[t]o attempt to obtain information on various mercaptan solutions in order to see if a satisfactory substitute for ammonium hydrogen sulfide can be worked out," for cold waving.[17]

that she was admittedly an experienced chemist when the test was made, ample means were available to test the pH of the solution by other methods if she felt her conclusion was inaccurate, and, perhaps most significant of all, the explicit purpose of her test was to determine the "effect of change of pH on effectiveness of cold waving solutions" (R. 614). Clearly, in determining pH with such a test objective, one would expect that she used great care. But, even assuming Mc-

Goldrick was in error, the Master's conclusion as to criticality of pH 10, as evidenced by McDonough's early test records, finds sufficient support in Brown's testimony that another of McGoldrick's 1940 tests showed a good wave at above pH 10 (R. 5782).

14. See R. 4966–5007.

15. Objections Covered: 60–87.

16. DP Exhibit 16, page 5.

17. Plaintiffs' Exhibit 25.

This evidence flies in the face of any claim by defendant that McDonough had completed his discovery of the critical limits for mercaptan waving three years before.

Defendant, on the basis of this and other evidence noted by the Master, is clearly not entitled to any pre-filing invention date.

## VII. The Prior Art

 Plaintiffs further relied on four categories of prior art references as grounds for invalidating the patent in suit:

(1) patents and publications disclosing reducing agents and mercaptans as permanent waving agents;

(2) patents and publications which disclose and describe the use of mercaptans as depilatories;

(3) a single publication in the field of colorimetric analysis describing a mercaptoacetic acid—ammonium hydroxide composition; and

(4) prior public uses by contemporaneous workers in the permanent waving art anticipating McDonough's claimed compositions.

35 U.S.C.A. § 102 provides in part that

"A person shall be entitled to a patent unless—

"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\* \* \* \* \* \*

"(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent \* \* \*."

1, 2.[18] The Master found, as to the first and second of the categories indicated, that the McDonough patent was anticipated by the second Speakman U. S. and Speakman Canadian Patents, by the U. S. Patent to Pye, and also by the McDonough and Evans U. S. Depilatory Patent. The Master also found that McDonough's claims were unpatentable for lack of invention over Maeder, Speakman, Pye and the depilatory art.

Pye [19] taught that when waving with reducing agents containing sulphur (the Master found, and I accept his interpretation of Pye's patent, that Pye included mercaptans among such reducing agents),[20] a pH of 8 to 11 was desirable to avoid depilatory action. Even accepting defendant's contention that Pye taught the art to stay above pH 9.0 to 9.5 when weak bases were used, there is a definite overlapping with McDonough's range of 7 to 10 or 7 to 9.5. Furthermore, "since Pye's objection to the lower pH range was the odor which accompanied low pH's,"[21] it would be obvious to one skilled in the art that if one were

---

18. Objections Covered: 88–126.

19. Objections Covered: 90–93, 98.

20. Defendant urges that Pye did not include organic sulfur compounds within his patent teachings since he spoke of sulfur compounds wherein sulfur has a negative valence of 2, and organic compounds have co-valence linkages, not ionizing linkages (Master's Report, p. 49). The Master recognized that technically this was true, but that Pye explicitly stated that these compounds could be organic. Defendant further answers, however, that Pye's organic compounds meant only compositions where an organic

base formed a salt with an inorganic sulfur compound. The Master apparently concluded that there is so slight a transition between ammonium hydrogen sulfide and the organic hydrosulfides, including the mercaptans, that Pye must have meant to include the latter. The Master's conclusion, reached after he had heard the testimony of experts for both parties (Brown, R. 2753–6; Snell, R. 5058; Defendant's Exhibit 326) is sound and certainly is not clearly erroneous. It is therefore affirmed.

21. Master's Report, p. 49. See also Pye's patent, Plaintiffs' Exhibit 151, Tab. 1.

not using the inorganic sulfides, but using mercaptans instead, the odor problem would be minimal, and there would be no reason to avoid the lower portion of Pye's recommended range from 8 to 11. Thus, Pye's patent both anticipates McDonough's patent and renders McDonough's claims unpatentable for lack of invention.

Speakman's [22] patents teach that the first step in waving is the reduction of the disulfide bonds in hair by various reducing agents, among which is listed the mercaptan, cysteine hydrochloride. The second U. S. patent and the Canadian patent indicate that best results are achieved when the solution in contact with the hair is at about pH 6 or pH 10 or above. McDonough merely discovered that mercaptans—a species of which had been named by Speakman—are more effective reducing agents than the prior art sulfides and that they should therefore operate at lower pH values and with lower concentrations.

Furthermore, Speakman's second U. S. patent both disclosed the use of pH 8 for direct application cold waving [23] and claimed a method of waving with alkaline solutions of an organic hydrosulfide (claim 7). "This claim," as the Master found, "reads directly upon all the claims of the patent in suit" since "alkaline" solutions include all solutions above pH 7, and mercaptans are within the definition of "organic hydrosulfides."

Defendant contends that Speakman teaches pH limits outside the critical limits disclosed by McDonough, and that cysteine hydrochloride is not identified as a mercaptan but is lumped with sodium hydrosulfide and other inorganic reducing agents to be employed at a pH of at least 10, where it damages hair. Defendant further urges that the net effect of Speakman's patent is to mislead the art as to the proper solution for mercaptan waving. Defendant either undervalues Speakman or treats him too harshly. His patents taught the general chemistry of cold permanent waving, and his second U. S. and Canadian patents, as already noted, contain a claim reading directly upon all of McDonough's. Furthermore, one skilled in the art, aware of Pye's teaching that hair destruction can be avoided by lowering the pH, could, without inventive genius, have reached McDonough's optimum range by lowering the pH of Speakman's solution of cysteine hydrochloride.

Defendant points out that claim 7 was not incorporated into Speakman's patent until 1938, and that by that time McDonough had already achieved his invention. But, as previously noted, the Master correctly found that McDonough did not achieve his invention until 1941. This contention therefore fails entirely.

The Evans and McDonough Depilatory Patent,[24] issued June 27, 1944 on an application dated June 20, 1938, was found to anticipate the patent in suit. Such a finding was clearly correct, since there is a substantial overlapping if not a close identity in the disclosures. Nor can McDonough avoid the Depilatory Patent by arguing that he is not "another" within the meaning of 35 U.S.C.A. § 102(e). The Master found no evidence to show that McDonough alone invented the depilatory patent.

Finally, the progress of the depilatory art before the date of McDonough's invention, together with the work of

22. Objections Covered: 94–104. Objection 95 is directed toward what is conceded to be a typographical error in the Master's Report.

23. Defendant contends that Speakman's reference to pH 8 is limited to the acidic range sulfites, and is not disclosed in connection with the use of cysteine hydrochloride. But the mere fact that Speakman, in his specific example disclosing the use of pH 8, employs as the reducing agent an acidic range sulfite, does not imply that he thereby excluded from this particular disclosure the use of his other listed reducing agents, including cysteine hydrochloride. Indeed, in the example itself, Speakman indicates this when he speaks more generally of the "reducing agent" employed. Plaintiffs' Exhibit 151, Tab. 4, page 3, left col. line 24

24. Objections Covered: 88–89; 105–126.

502

Maeder, Speakman and Pye,—all of which the Master describes—is ample support for his conclusion that McDonough's present claims are unpatentable for lack of invention.

3.[25] The Master found that McDonough's composition fell squarely within the boundary lines of a composition formulated and described by Leavell and Ellis in 1934. The Leavell and Ellis reagent was for use in determining the iron content of blood and milk, by means of colorimetric analysis. Such a science is plainly not analogous to the subject matter of McDonough's patent.

Defendant first attacks the Master's finding that the Leavell and Ellis reagent is within the limits of McDonough's claims. This depends on whether the reference, calling for "undiluted mercaptoacetic acid" and "concentrated ammonium hydroxide," should be read to call for 100% mercaptoacetic acid and for 28% ammonium hydroxide. If the reference calls for some other concentrations of these chemicals, the pH of the reagent is outside McDonough's upper limit of 9.5.

The Master's finding that 100% mercaptoacetic acid was called for by the reference is amply supported by the evidence. There was testimony which indicates clearly that a reader versed in the art of colorimetric analysis would use 100% mercaptoacetic acid when reading the reference. Even without the presumption which a finding based on such testimony assumes, the Master's conclusion would be sustained. As for the ammonium hydroxide required by the reference, there was also sufficient evidence in support of the Master's finding. Defendant offered testimony indicating that some "concentrated" ammonium hydroxide might assay in various ranges between 26%–30%. But there was convincing support for the Master's conclusion that 28% was the standard American solution of concentrated ammonium hydroxide and that this is the concentration called for in the reference.[26]

Defendant further urges, however, that even if the Leavell and Ellis reagent falls within the McDonough limits, it does not anticipate the patent in suit, since the reference is in a non-analogous art, and McDonough has carved his claims so as to avoid the Leavell and Ellis composition. But, as the Master found, this argument assumes the very point in issue—the existence of a patentable subject matter. If there is already in the public domain a composition which falls within the alleged critical limits, there is, to begin with, no valid invention. Nor can McDonough obtain a valid patent by introducing in his claims artificial and admittedly non-critical limitations. No invention based on such limits was disclosed in his specification. 35 U.S.C.A. § 112.[27] Finally, in view of the work of Speakman and Pye, McDonough cannot claim as his invention a new use for an old composition. 35 U.S.C.A. § 101.

4.[28] The Master found that McDonough was anticipated by virtue of the prior reduction to practice of at least one species of mercaptans by Grant and by Martin, and that "of all the people

25. Objections Covered: 127–148.

26. Certainly the Master's conclusion is as certain as it is possible to be certain of the meaning of the reference to one "versed in the art of colorimetric analysis." "[T]here exist no devices which 'will infallibly lead to one correct understanding and meaning,' because, in dealing with other's words, 'men certainly see through a glass, darkly.'" Judge Jerome Frank, 61 Yale L. Journal, 1109 (June–July 1952).

It is to be noted also that even Snell, defendant's own expert, felt that 28%

"was the grade normally considered by chemists in the United States as being 'concentrated ammonium hydroxide.'" Plaintiffs' Exhibit 79, p. 170 (Snell's affidavit discussing Leavell and Ellis reference) and R. 5156.

27. Furthermore, claims 1, 4, 6, 7 and 10 read directly on the Leavell and Ellis composition if the adjustment clause is eliminated, and, as indicated, infra, the adjustment clause constituted new matter and cannot be claimed.

28. Objections Covered: 149–175.

working in the field of mercaptan waving * * * it took McDonough longer to conceive and to develop a satisfactory waving lotion than anyone else."[29]

In determining whether a claimed invention is patentable, it is proper to consider the contemporary progress of the art at the time the claimed invention was achieved. Ruben Condenser Co. v. Copeland Refrigeration Corp., 2 Cir., 1936, 85 F.2d 537, certiorari denied 1937, 300 U.S. 665, 57 S.Ct. 508, 81 L.Ed. 873; Application of McKenna, 1953, 203 F.2d 717, 40 C.C.P.A.,Patents, 937 and 1 Walker on Patents, pp. 119 et seq. The findings of the Master, as to the progress of the art, have substantial support in the record. Furthermore, an invention is not patentable if it was "known or used by others" before the invention by the applicant. 35 U.S.C.A. § 102(a). The evidence supports the Master's conclusion that Martin and Grant reduced to practice at least one species of mercaptans prior to McDonough's application date. Defendant's contention that McDonough had reduced the same species to practice long before either Grant or Martin is unavailing, since any claim by McDonough is invalidated if, *before his invention date,* a species within his generic claims was reduced to practice by another.[30]

 Defendant further urges that the Master, while holding McDonough to the strict standard of proof of the United Shoe case, supra, to establish a pre-filing date of invention, failed to require such a strict standard of proof by plaintiffs of Martin's and Grant's work anticipating McDonough. Strict proof is always required for prior use evidence. Zachos v. Sherwin-Williams Co., 5 Cir., 1949, 177 F.2d 762. I find no justification for defendant's complaint. In discussing Martin's and Grant's work, the Master notes that it is "quite clear" (p. 81 of Master's Report) that Martin and Grant both anticipated McDonough; that the "evidence is convincing" (p. 78 of Report) that Grant arrived at the generic invention before McDonough; and that there is "no doubt" (p. 77 of Report) of the results of Martin's independent work.[31] All the quoted phrases indicate that the Master was aware of the quantum of proof required and did, indeed, require a high standard of proof of the plaintiffs in proving Martin's and Grant's work.

## VIII. Inoperativeness, Indefiniteness, New Matter

The Master's final series of holdings as to the validity of the patent relate to Inoperativeness, Indefiniteness and New Matter Amendments. His conclusions are attacked in part by both parties.

 (A) *Inoperativeness:*[32] The Master found as a fact that three of the 37 mercaptans within McDonough's claims could not be used as waving agents. This finding, based on the testimony of Brown, is certainly not clearly erroneous. While recognizing the general rule that "generic claims are invalid

---

29. Master's Report, p. 81.

30. Ex parte Fryling, 1947 C.D. 5, 8; 604 O.G. 5 (Board of Appeals) relied upon by defendant, does not indicate to the contrary. Defendant reads Fryling to hold that if, prior to a generic chemical invention, another person reduces to practice a species within the genus, such a reduction does not anticipate the generic invention if the inventor himself reduced the same species first. Hence, defendant urges that Martin and Grant's reduction to practice of a species of mercaptans as waving agents does not anticipate McDonough, since McDonough reduced the same species to practice first. But Fryling held only that the applicant there was entitled to patent his generic invention since he had "made a showing sufficient in this case *to show a generic invention prior to the reference.*" Fryling by no means supports defendant's position that the mere reduction of a species, not itself sufficient to constitute an *invention,* prevents anticipation by others through reduction of the same species prior to the generic invention.

31. Martin's work is discussed in Master's Report at pp. 75–77; 79; 81–82. Grant's work is discussed at pp. 77–78 and pp. 81–82.

32. Objections Covered: 176–181.

where so broadly drawn as to include compositions which do not produce the stated result,"[33] the Master, in view of the overwhelming evidence of invalidity on other grounds, found it unnecessary to decide whether the inoperativeness of two or three of so many compounds was ground for invalidating the claims. For the same reason, I find it unnecessary now to go beyond the Master's finding.[34] The Master's conclusion that the patent is not invalid as inoperative because of the odor or possible toxicity of some of the mercaptans specified is also affirmed. As the Master found, total elimination of odor is not required to support operativeness here, and as to toxicity, plaintiffs showed only that some of the mercaptans might be toxic when administered in certain ways. Furthermore, there is little fault to find with the Master's conclusion that no reasonable person would use strychnine in a waving composition even if it falls within McDonough's specification.

■■■ *Indefiniteness:*[35] The law requires that patent claims be stated with a precision that leaves no doubt as to the precise scope of the monopoly which is claimed. The description must be "full, clear and concise" so that "the process can be utilized by those skilled in the art. * * * [N]o inventor may compel independent experimentation by others to ascertain the bounds of his claims." Standard Oil Co. of California v. Tide Water Associated Oil Co., 3 Cir., 1946, 154 F.2d 579, 581, 583. See also Libbey-Owens-Ford Glass Co. v. Celanese Corp., 6 Cir., 1943, 135 F.2d 138, certiorari denied 1943, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442, and Innis, Speiden & Co. v. Food Machinery Corp., D.C.Del.1943, 49 F.Supp. 722, 726–727.

■■■ I concur with the Master's finding that the patent in suit is invalid for indefiniteness. The testimony of McDonough and Snell, offered by defendant, pertinent extracts of which are quoted by the Master, conclusively demonstrates that even they could not agree on the meaning of many of the limits stated. How possibly can the producers of commercial products, some of which infringe under one interpretation of the claims, and do not infringe under another interpretation, know when they run afoul of McDonough's patent.[36] This is the very type of ambiguity condemned by the patent statute. Standard Oil Co. of California v. Tidewater Associated Oil Co., supra.[37]

---

33. Master's Report, p. 84.

34. Plaintiffs, as to this finding, make one of their few objections to the Master's report, urging that the general rule as to the invalidity of generic claims, when too broadly drawn, should apply to invalidate the claims in issue here. But a review of the cases indicates that claims have been held invalid only where a substantial number of the elements they include are inoperative. In view of this fact, I am unwilling to hold that the inoperativeness of only two or three of McDonough's compositions justifies invalidating his claims.

35. Objections Covered: 182–194.

36. As to the expression "not higher than 9.5," for example, McDonough testified that this expression would mean up to 9.54. Snell's infringement charts, on the other hand, indicate that the scope of the claims is only up to 9.5. Yet the Master found that several current commercial products would infringe if McDonough's definition were accepted, but would not infringe under Snell's interpretation of the claims. Cf. Defendant's Exhibits 524, 525.

Cf. also the statement of Logan R. Crouch, "The Inventor In the Courts: Confusion as a 'Standard' for Invention." American Bar Association Journal, Vol. 40, p. 103 at 104 [Feb. 1954]: "Patent law is highly technical. But when any particular case is properly explained, there is nothing mystic or intangible about it."

37. In patent law, perhaps more than in any other area of the law, each of the words employed is of great weight and significance. In this branch of the law we are not then to relax as quickly as some critics of the lawyer's tendency to overplay the significance of word precision might advise. Cf. Max Radin, A Juster Justice, A More Lawful Law, in Essays in Honor of Orrin, Kim McMurray 537 (1935): "Philologers may love words but they do not venerate them, nor very much respect them. And above all, they are

Furthermore, the description of the "see-saw" or adjustment clause is clearly indefinite. Its graphic presentation was the subject of sharp dispute between the parties, as was the question whether to portray pH on a linear or logarithmic scale. Plaintiffs object to what they assert was the Master's failure to find claims 2, 3 and 11 through 18 indefinite because of the adjustment language. This objection is without merit, since it is clear that the Master found all claims containing the adjustment clause invalid for at least that reason.[38]

*New Matter Amendments:*[39] As the Court of Appeals for this Circuit indicated in Engineering Development Laboratories v. Radio Corp. of America, 2 Cir., 1946, 153 F.2d 523, claims may be amended without affecting their validity if the alterations can be supported by a reasonable interpretation of the original disclosures.

The Master found that amendments of the specification as to concentration and pH ranges did not contain invalidating new matter. I am convinced, after careful examination of the relevant exhibits, that the Master's conclusion is correct. The various concentration ranges of the amended specification examples for hot waving were derived by cross division of the concentrations given in the original examples, and such cross division was taught originally. For cold waving, the hot waving examples were cross-multiplied by 3 and by 5, also as originally taught.[40] Similar limitations, all within the areas originally disclosed, were applied to the pH and molecular weight of the compositions given in the amended specification. Plaintiffs contest the Master's finding that these amendments were not invalidating new matter. But these amendment limitations constituted only a narrowing of the range originally disclosed. They were not contrary to the original teachings, and no reason was shown why defendant should be prohibited from so limiting the original teaching. Nor is plaintiffs' contention valid that the Master erred as to the law, when he stated "It cannot be said that a narrowing of the range constituted * * * new matter." Read in the context of his discussion of the amendments, it is clear that the Master meant only that the narrowing of the ranges *in this instance* did not constitute new matter. The Master recognized the rule that even a narrowing of the range may constitute invalid new matter if the effect is to change the invention claimed. Girdler Corporation v. E. I. DuPont de Nemours & Co., D.C.Del.1945, 59 F.Supp. 583, affirmed 3 Cir., 1946, 152 F.2d 757.

The Master, in fact, applied this rule in holding that the adjustment clause was invalid. He found that the adjustment clause in both the specification and in claims 1, 4, 5 and 6 through 10, established a relationship between mercaptan concentration and pH not disclosed by, and indeed contrary to, the teachings of

not afraid of them. Now, no one is really more afraid of a word than a lawyer, unless it is an exact scientist. Both have a dread of what may be contained in the few syllables of the words they use, a fear which is only equalled by some tribes of primitive men. If lawyers had the experience of philological training, they would know words for what they are, and would not hang desperately on a wretched explosion of breath when their task required them to do justice between man and man." Quoted by Judge Jerome Frank in 61 Yale L. Journal 1110 (June–July 1952).

38. In dealing with the various phrases which he held indefinite, the Master did not repeat his analysis of a phrase for each claim in which it appeared. He clearly intended, however, to hold that all claims containing an indefinite phrase were invalid on that ground at least. It should be noted that the adjustment relationship was not read into claims 12, 17 and 18 [infra note 43]. These claims, therefore, would not be indefinite by reason of the adjustment clause.

39. Objection Covered: 195–197.

40. The highest figure obtained by such multiplication was lopped off since it alone fell outside of the original concentration limits.

the original disclosure. Defendant urges that McDonough's original application, especially at pages 13–15,[41] discloses implicitly the basic teaching of the adjustment clause. It is true that the original application makes clear that waving speed is geared in large measure to mercaptan concentration and can be controlled by adjusting concentration. But the original application does not, implicitly, or explicitly indicate that an *inverse relationship* between pH and concentration is a valuable technique for effective, controlled waving. Such a teaching is the crux of the adjustment clause. Indeed, where the pH-concentration relationship is considered in the original application, the specification teaches that both high pH *and* high concentration are required for effective cold waving.

## IX. Infringement [42]

■ The Master's findings as to infringement are attacked by both parties. Plaintiffs contend that the indefiniteness, vagueness and contradiction of the patent claims make any finding of infringement invalid. Defendant, on the other hand, urges that a proper interpretation and graphic presentation of the claims show that all the accused products infringe. The obvious answer to plaintiffs is that the Master's findings of infringement were presented as the most accurate conclusions possible in the event the Master's other conclusions are overturned and the patent is declared valid. In answer to defendant, I am convinced that insofar as the ambiguous claims of the patent can be set down with a precision adequate to measuring infringement, the Master's interpretation of the claims is accurate. Specifically, a linear interpretation of pH appears, on the basis of testimony offered and the methods used by the parties, the appropriate scale in this proceeding. As to claims 2, 3, 11, 13 and 14, while the adjustment language is less clear than in claims 1, 4, 6, 7 and 10, Snell testified that the same adjustment relationship between pH and concentration is taught in claim 2, which is similar in this respect to claims 3, 11, 13 and 14.[43] Defendant has shown nothing to warrant disagreement with the Master's interpretation of this testimony.

## X. Defendant's Counterclaim against Helene Curtis [44]

■ Defendant raises numerous objections to the Master's holding that its counterclaim against Helene Curtis be dismissed. The counterclaim alleged tortious interference by Helene Curtis with the prosecution of McDonough's application for the patent in suit. Essentially, Helene Curtis is said to have committed three wrongful acts:

(1) the filing of a formal protest with the Patent Office on April 4, 1948, against the issuance of the McDonough patent;

(2) Making oral statements to the Examiner in or about the months of April and May 1948 for the purpose of

41. Plaintiffs' Exhibit 104.

42. Objections Covered: 198–212.

43. It is to be noted that some of the claims, containing the same adjustment language as claims 2, 3, 11, 13 and 14, were read without the adjustment relationship. (Claims 12, 17, 18. See Master's Report, p. 106). Plaintiffs argue that the adjustment relationship should be read into all the claims, and, as previously noted (note 38, supra) objected to the Master's failure to find all the claims indefinite because of the adjustment clause. It is to be noted, however, that while claims 12, 17 and 18 include the adjustment language of claim 3, either directly or by reference, each of these claims stated a specific concentration or pH for the solution claimed. A solution limited to a single concentration or pH does not have a range in which to apply the adjustment relationship and the most reasonable interpretation of the claims excludes the adjustment clause.

44. Objections Covered: 213–290.
 Defendant also asserted a counterclaim against Gillette, but since it was abandoned in fact, if not formally, it was dismissed by the Master. The dismissal is affirmed. Defendant's objection 291.

inducing him to disallow McDonough's application; and

(3) furnishing erroneous information to the Patent Office in the fall of 1950 as to the pH of the Leavell and Ellis reagent and the purity of commercial thioglycolic acid.

The Master found that the proof fell short of establishing that the Patent Office was ready to approve McDonough's patent prior to the intervention of Helene Curtis, nor was there ample showing that Helene Curtis' actions delayed issuance of the patent. These conclusions are amply supported by the evidence.

Aside from the count in interference with the Martin application,[45] there was no showing that any of McDonough's claims were about to be allowed.[46] In fact, the evidence is quite convincingly to the contrary. A statement of the Primary Examiner dated January 6, 1949 (Plaintiffs' Exhibit 2, at p. 744), and a statement of the Supervisory Examiner also dated January 6, 1949 (Plaintiffs' Exhibit 2, at p. 527) emphasize that nothing in the record shows that McDonough's claims were about to be approved prior to the intervention of Helene Curtis.

Defendant also failed to show that Helene Curtis' action delayed issuance of the patent.[47] Defendant asserts that McDonough moved to dissolve the Martin interference by conceding the unpatentability of his claim in June 1947; but that despite this admission, the Patent Office on December 9, 1947, suggested that a new count be made the basis of the interference "[s]ince there is undoubtedly a common invention involved." The Patent Office action, defendant contends, amounts to a ruling, even after McDonough's concession of the unpatentability of one of his claims, that the claim contained patentable subject matter. Hence, it is urged, the subsequent disallowance of the entire patent in June 1948, could not have been occasioned by McDonough's own admission. Since Helene Curtis' intervention took place in April 1948, defendant points to this action as the cause of the disallowance two months later.

Defendant neglects to mention, however, that not only in June 1947 but also in December 1947, and in January and February 1948, McDonough moved the Examiner to strike from his decision the proposed new count and dissolve the interference.[48] When the Examiner did so

---

45. In February, 1947, the Examiner had declared an interference between McDonough's application and the application of Harry Martin, both of which, according to the Examiner, disclosed a common invention. The Master accepted, at least arguendo, defendant's proposition that patentability must have been found or an interference would not have been declared (Master's Report, p. 109). Such a conclusion finds reasonable support in Rule 95 of Rules of Practice in the U. S. Patent Office (Defendant's Exhibit 560).

46. Defendant asserts that the Master erred by holding that a formal allowance of claims had to be shown before any objection could be made to Helene Curtis' interference. Such an assertion is obviously without merit, the Master having neither made nor implied such a statement. Defendant states, at page 6 of its Brief in Support of Its Counterclaim, that

"The Special Master considered the 'ultimate fact necessary to sustain defend-

ant's cause of action' (Master's Report p. 111) to be formal allowance of claims by the Patent Office. * * *"
The weakness of defendant's argument is clear from the full quotation from p. 111 of the Master's Report:
"Accordingly, the ultimate fact necessary to sustain defendant's cause of action, that Helene Curtis' actions were responsible for delaying the issuance of the patent, is not supported by the evidence."

47. Nor is there ground for defendant's assertion that the protest was illegally filed because the file in the interference proceeding, upon which the protest was based, was not voluntarily disclosed to Helene Curtis. It is clear from the testimony of Martin himself that he voluntarily showed the file to Cayne and Grant. R. 353, 356–7, 369–70.

48. Plaintiffs' Exhibit 45 at pp. 135, 149, 165–6, 174–96.

in June 1948, he rejected McDonough's other claims as well. It is entirely possible, and, as the Master found, probable, that this action by the Examiner was based on McDonough's own concession of unpatentability of the claim in interference, since in rejecting this claim, the Examiner would generally review the other claims, especially when each of McDonough's other claims at that time was either broader than the claim in interference, or contained at least one or two features common to it.[49] Certainly defendant did not prove that Helene Curtis' action was the cause of the rejection of McDonough's claims, or at the very least more likely the cause than McDonough's own action.

Sales Affiliates rebukes the Master for his "holding" that the Patent Office Examiner makes allowances for exaggerations, and overly broad statements in a protest. The Master, of course, only *noted* in passing that realistically, disgruntled inventors or competitors protesting another patent may exaggerate, and that the Patent Office undoubtedly recognizes such a possibility.[50] His decision was not grounded on this. What the Master did *hold* was that defendant failed to show that Helene Curtis' protest contained any misrepresentation. This finding was correct.[51]

Defendant charges Cayne, an attorney for Helene Curtis, with having made improper statements to a Patent Examiner regarding McDonough's application. The evidence, however, clearly supports the Master's conclusion that Cayne only inquired into the possibility of reviving the Grant application.[52] Cayne was entirely within his rights in doing so.

Defendant also charges Cayne with misrepresenting the pH of the Leavell and Ellis reference to the Patent Office, and with creating the impression that commercial thioglycolic acid had a purity of nearly 100%. As to the Leavell and Ellis reference, Cayne merely reported a pH of 9.2 to 9.25. This report was based on tests which so indicated the pH,[53] and the misrepresentation was not shown to be deliberate either on Cayne's part, or on the part of those who conducted the tests, even though it was, in fact, %0ths of a pH unit off. Nor is there evidence which supports the charge that Cayne attempted to create the impression that 100% thioglycolic acid was the commercial grade. He said only that "It is possible to make up thioglycolic acid up to 97% and 98% pure. This would be a laboratory sample."[54]

In summary, there is no adequate showing that Helene Curtis acted tortiously with respect to McDonough's application during its pendency in the Patent Office. While, perhaps, absence of a showing of damage would not defeat the defendant's counterclaim if the

---

49. The Supervisory Examiner, in January 1949, noted that "the interference proceeding which was dissolved June 16, 1948, probably provided the occasion for a review of the question of patentability. * * *" Plaintiffs' Exhibit 2, p. 528.

50. Master's Report, pp. 111–112.

51. That part of the protest which disputes the criticality of McDonough's limits is wholly in accord with the Master's finding as to criticality. And Grant's statement, as to the mid-point of the pH range, is correct if based on a linear scale reading of pH. In view of the dispute on this point and defendant's own inconsistency in representing pH, Grant's statement was hardly shown to be a deliberate misrepresentation. Defendant also charges that Grant, in his affidavit accompanying the protest (Defendant's Exhibit 223 at p. 3 of Grant's affidavit), made a wilful misrepresentation in asserting that he

"*believed* a pH range of 7 to 12 was a generally desirable range in which to operate. * * *"

Read together with the further explanation of Grant's patent application, contained in the protest, it is clear that Grant intended this as only a general statement, qualified and elaborated upon in accompanying phrases. It is clear it was not deliberately false; in fact, as a general statement, it may not have been false at all.

52. See extracts from Wolk and Stone depositions at p. 113 of Master's Report.

53. Defendant's Exhibit 239.

54. Defendant's Exhibit 17.

defendant had in fact established the commission of a tort, I am in accord with the Master's statement of the law that a "claim sounding in tort must be predicated upon some legally cognizable damage occurring to the aggrieved party as a result of the wrongdoer's acts" before some recovery is to be awarded. What damage could have been done defendant in the instant case even if Helene Curtis had delayed the issuance of the invalid patent is difficult to perceive. If defendant had no right to a patent, it could not have been injured by any delay in the issuance of that patent.

### XI. Exclusion of Evidence [55]

Defendant urges that the Master erred in excluding testimony of a conversation between Maurice Cayne, counsel for Helene Curtis, and James Dwyer, one of the counsel for Sales Affiliates. Cayne called Dwyer in 1948, concerning the settlement of another lawsuit between the parties, and purportedly stated that unless Sales Affiliates settled the pending lawsuit and granted Helene Curtis a royalty-free license under the McDonough application, Helene Curtis would protest the issuance of the McDonough patent. Defendant contends that the evidence was admissible as evidence of malice, and that it is therefore relevant to defendant's counterclaim.

 The Master excluded the testimony since the conversation alone, directed toward the settlement of another law suit, was not itself improper.[56] Such exclusion was proper. Settlement discussions are normally understood between the parties to be privileged. I fail to see how this conversation, either standing alone or considered in connection with other acts by Helene Curtis, is evidence of malicious intent on the part of plaintiffs. In any event, the admission of this testimony would not have altered the ultimate conclusion reached, with which I concur.

### XII. Patent Misuse and Unclean Hands [57]

 During the trial before the Master, plaintiffs invoked the doctrines of patent misuse and unclean hands as a complete defense to the defendant's counterclaim for infringement. Such a defense, if proved, prevents a patentee from seeking relief from infringement in a court of equity. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

 The alleged misrepresentations pertain to three unrelated subjects.[58] The Master found that none of these charges was sustained by the evidence.

The first charge was that defendant concealed and suppressed the authorship and inconsistent results of certain tests purportedly made by Snell, which it submitted to the Patent Office, and the 4915 Court. Plaintiffs, at the Hearing on Confirmation of the Master's Report, withdrew from their previous position that Snell had not authored the tests.[59] They still assert, however, that defendant was guilty of deliberate misrepresentation in failing to reveal that McCormick, who, acting under Snell's su-

---

55. Defendant's Objection E.

56. Counsel for Sales Affiliates admitted that the settlement discussion itself was proper but urged that it showed malice in view of other acts by Helene Curtis. Record p. 5433 et seq.

57. Objections Covered: 292–297.

58. Plaintiffs also charged defendant with misuse of the patent in violation of the anti-trust laws. The Master found that this charge was not proved at the trial and plaintiffs have made no objection to this conclusion. Defendant urged, at the end of the trial, that the charge of unclean hands constituted a charge of "fraud" which must be stated with particularity and a full recital of the facts relied upon. Rule 9(b), F.R.C.P. But, as the Master noted, this defense developed at the trial, as an outgrowth of the evidence presented, and both sides were fully aware of the facts upon which the charge was based. The Master was entirely correct in refusing to strike the defense for want of particularity.

59. Hearing on Confirmation of Master's. Report, p. 106.

pervision, carried out the tests (which were offered as those of an independent and uninterested expert), was an assistant of McGoldrick's and an Evans employee.[60] Plaintiffs also urge that the test records show that Snell, who supervised the tests, reported only selected results consistent with defendant's claims of criticality.

Clearly McCormick's connection with the Evans Laboratories should have been revealed, and the Exhibits strongly indicate that this relationship was deliberately concealed.[61] Nevertheless, the Master found, and plaintiffs concede, that Snell was the author of these tests. They were under his direction and the conclusions were subject to his approval. There is no evidence that they were not the completely impartial tests they were stated to be. By reason of the surrounding circumstances, I cannot conclude the defendant is guilty of unclean hands, on this charge.

As to the alleged concealment of inconsistent results in Snell's work, I also agree with the Master that a finding of unclean hands is unwarranted. Plaintiffs have correctly shown that many results contrary to defendant's assertions of criticality were not reported.[62] But defendant offers the explanation that Snell's objective was to ascertain the limits within which maximum curl tightness could be achieved without damage. Tests with a particular solution were therefore run at different time intervals to determine at which point maximum curl tightness was achieved and whether, at that point, hair damage existed. In this experimentation with many different solutions, defendant urges, Snell found some tests conclusive and others not. In such technical, experimental work, with so many variables affecting the conclusions reached (which themselves are in large measure subjective) I am in accord with the Master, and I cannot say with any reasonable degree of certainty that there has been deliberate misrepresentation.

The second alleged misrepresentation is that McDonough deleted certain matter from a laboratory record submitted to the Patent Office to remove the second Speakman Patent as a reference.

The McDonough record presented to the Patent Office indicated that he had used cysteine hydrochloride as a waving agent in 1935, and thereby anticipated Speakman in this respect. Only a part of the record, however, was presented to the Patent Office. That part omitted included the very significant statement that the solution McDonough used in 1935 was in the acid range, below pH 7.[63] Since Speakman disclosed the use of "alkaline solutions of organic hydrosulfides," McDonough's use of an acid solution did not anticipate Speakman. Had the omitted fact been made clear, Speakman would not have been so unceremoniously removed as a prior art reference.

While all this is clear by the use of hindsight at this late stage of these proceedings, it cannot be said with any reasonable assurance that when this incomplete record of McDonough's work was presented, the meaning of Speakman's patent, and what was necessary to remove it as a reference, was so obvious.

---

60. McGoldrick was one of McDonough's laboratory assistants and both McGoldrick and McCormick were Evans employees.

61. Plaintiffs' Exhibit 237, the Snell notebook in which the tests were copied, contains a statement of McCormick's qualifications, including the following, in her own handwriting: "Also I received Special Training for three years in the laboratories of Evans Research and Development Corporation under Miss Virginia McGoldrick." Snell's affidavit, submitted with the test results, however, while it states *all* McCormick's other qualifications listed in the notebook, fails to mention her association with Evans Laboratories and Miss McGoldrick (p. 5 of affidavit. Plaintiffs' Exhibit 2, Vol. 2, p. 343).

62. Snell's "Record of Experimental Data" produced by plaintiffs at Hearing on Confirmation of Master's Report.

63. Plaintiffs' Exhibit 10. It is also true that this was a *hot* waving solution. Master's Report, p. 125.

Defendant, after all, contended then and still urges that Speakman's claim 7 disclosing alkaline solutions of organic hydrosulfides does not refer to mercaptans,[64] and that the pH 8 reference in his specification is restricted to the acidic range sulfites and does not include cysteine hydrochloride. Defendant further urges that the only issue at the time McDonough submitted the 1935 record abstract was whether McDonough had, prior to Speakman, used cysteine hydrochloride as a waving agent, regardless of pH. As the Master found, the evidence presents a doubt as to the wisdom of McDonough's conduct, but it is insufficient to establish wilful misrepresentation. Corona Cord Tire Co. v. Dovan Chemical Corp., 1928, 276 U.S. 358, 373–374, 48 S.Ct. 380, 72 L.Ed. 610.

Plaintiffs also contend that a similar omission from one of McGoldrick's reports is evidence of defendant's deliberate distortion of test records to present a stronger case for its patent. McGoldrick, in reporting tests made with various pH solutions, noted at the bottom of one of her test records that the reported pH may have been inaccurate and that a correct pH for any of the solutions reported might be two-tenths higher than the pH's recorded. If this were so, a successful wave would have been indicated, in one test, at pH 9.8.[65] McGoldrick's notation, however, indicating the pH adjustment, was deleted from a photostat of the record when it was produced for the Patent Office. I am not prepared to say, because of this, however, that the incomplete record constituted deliberate misrepresentation sufficient to soil defendant's hands and bar it from its place at the table of equity. McDonough apparently felt that this suggestion that the pH was inaccurate was without merit.[66] It was, after all, only a cautionary note McGoldrick attached to her test record. Furthermore even the incomplete record submitted showed a successful wave obtained at pH 9.6. While the whole record should have been reported, the omission is not a sufficient basis for the inference of deliberate misrepresentation that the plaintiffs urge should be drawn.

As to plaintiffs' final charge that defendant deliberately misrepresented the pH and acid concentration of the Leavell and Ellis reference to the Patent Office, the evidence is entirely inadequate to support such a finding. Snell and defendant were fully entitled to take the position that the reference called for less than 100% mercaptoacedic acid. In using acid from Eimer and Amend, which assayed at about 82%, they accordingly calculated a pH of 9.61, which, with this acid, was correct. Plaintiffs urge, however, that by erroneously stating the percentage of mercaptoacetic acid in the final solution to be 8.37%, defendant indicated that 100% acid had been used. An examination of the Snell affidavit in which these figures were stated fails completely, however, to support a

---

64. Defendant also urges that claim 7 was not introduced into the Speakman application until March 15, 1938, and that McDonough's 1946 affidavit, swearing back of Speakman, was directed only at the disclosure of the use of cysteine hydrochloride in Speakman's original application. Defendant asserts that McDonough believed and contended as a matter of law that the 1938 amendment spoke only as of the date Speakman's patent was issued in 1941, *after* McDonough's filing date. Such a contention is significant insofar as it reveals defendant's intention in submitting the 1946 record and affidavit. As to the question of the effect of the 1938 Speakman amendment, that amendment speaks as of 1938, at least insofar as it stands as a reference. McDonough's 1935 record showing a use of cysteine hydrochloride in an acid solution, below pH 7, would therefore be ineffective in removing Speakman as a reference after the disclosures of the 1938 amendment (even if the pH 8 reference in Speakman's specification is disregarded. See —— F. Supp. —— supra). Cf. Alexander Milburn Co. v. Davis-Bournonville Co., 1926, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

65. Plaintiffs' Exhibit 100; Plaintiffs' Exhibit 2 (McDonough's File History), pp. 162, 166.

66. R. 2173–4, 4144–7.

finding of wilful misrepresentation.[67] His calculations are fully set out and there is little or nothing to indicate that any misrepresentation was intended. In fact, there was no misrepresentation at all if Snell intended to give the concentration of the Eimer and Amend acid used, rather than the concentration of mercaptoacetic acid. Snell testified that his purpose was to do the former.[68] Before the 4915 Court, defendant did no more than to adhere to its position that the pH of the Leavell and Ellis reference was 9.6 or higher—based on the use of less than 100% mercaptoacetic acid.

■ It is appropriate to note, that while some of the incidents raised by plaintiffs might arouse some suspicion when viewed together, their occurrences were by no means related. In view of the protracted litigation this patent has experienced,[69] and the thousands upon thousands of pages of testimony and exhibits in the various proceedings, these isolated incidents, when viewed separately as they arose, are not nearly strong enough to sustain a finding of unclean hands. See e. g. Shinsaku Nagano v. McGrath, 7 Cir., 1951, 187 F.2d 753, 759.[70]

## XIII. Attorneys' Fees

■ Plaintiffs urge the Court, in the exercise of its discretion under 35 U.S.C.A. § 285, to award them reasonable attorneys' fees.[71] Their request has been grounded primarily, but not entirely, on the assumption that the Court will find the defendant guilty of "unclean hands."[72] I have already found that the Master properly concluded that defendant's conduct in obtaining its patent does not warrant a holding of "unclean hands."[73] I further conclude that defendant's zealous efforts on behalf of its patent and against the plaintiffs does not justify taxing defendant with plaintiffs' attorneys' fees.

"The principles which guide and control such an allowance are clear. The power is statutory * * * and it is phrased in terms of judicial discretion. * * * But in

67. Plaintiffs' Exhibit 79, pp. 168–171.

68. R. 5155; 5349 et seq.

69. Application for the patent in suit was originally made in 1941. After seven years, the application was finally rejected in June 1948. Defendant then succeeded in 1951 in the 4915 suit, in obtaining a court order that the patent be issued. Upon issuance of the patent, a rash of litigation broke out, as described in a previous opinion of this Court. See footnote 1, supra, and see Plaintiffs' Exhibit 2 (McDonough's File History); Plaintiffs' Exhibit 78 (Record of the 4915 suit).

70. "The doctrine [of unclean hands] applies only to willful as distinguished from negligent misconduct [and], is not * * * applicable to every inconsistent act of a party but [only] to conduct which is 'unconscionable' or 'morally reprehensible.' " Shinsaku Nagano v. McGrath, supra.

71. The patent statute provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C.A. § 285.

72. Plaintiffs base their request for attorneys' fees on the "hopeless invalidity of [the] patent, the circumstances of its grant, the inequitable manner of its assertion and the consequences to the public and [the] adverse parties" of the defendant's alleged misconduct in harassing the industry. See Memo for Plaintiffs on Master's Report, p. 39. See also p. 85 et seq. of Record of Hearing on Confirmation of Master's Report.

73. Mr. Ashton stated upon the hearing on confirmation:
"I wanted to make it very clear at the outset that we are not severely critical of the Master because he failed to sustain this defense. Our position is only that the Master dealt too leniently with Sales Affiliates in failing to sustain the defense, notwithstanding his findings that in the prosecution of the application and in the 4915 Court that Sales Affiliates was guilty of concealment of material facts."
I do not agree that the Master was "too lenient." Rather, I believe, that the severity demanded by plaintiffs is not justified in the absence of wilful concealment of material facts (p. 85 of Record of Hearing on Confirmation of Master's Report).

granting this power, Congress made plain its intention that such fees be allowed only in extraordinary circumstances. * * * The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear." Park-In-Theatres v. Perkins, 9 Cir., 1951, 190 F.2d 137, 142.

While the litigation provoked by Sales Affiliates has been extensive,[74] this Court is not convinced that defendant has been guilty of such unfairness or bad faith as to warrant taxing it with plaintiffs' attorneys' fees. In the instant litigation this would be a most extraordinary remedy when the formidable fees which have been expended in this extensive litigation are considered. McDonough, after all, had been granted Letters Patent. The patent had been obtained only after years of determination and zeal in the belief that there was present here an invention worthy of patent.

The patent was first rejected after seven years of patent office proceedings and issued as a result of a 4915 proceeding, more than ten years after the filing of the application in the patent office.

In a previous Opinion of this Court I have been critical of the multiplicity of suits instituted by Sales Affiliates to enforce its patent rights. However, while defendant's vigor and zeal to obtain and uphold its patent might on occasions have driven it to the point of overzealousness, I am not prepared to say that it acted with such bad faith or unfairness as to warrant an award of attorneys' fees to the plaintiffs.

## Conclusion

The recommendation of the Master [75] that judgment be entered in all actions declaring United States Patent No. 2,577,710 invalid; dismissing the complaints in Civil Actions Nos. 76–375 and 76–376; and dismissing all counterclaims for infringement and damages in Civil Actions Nos. 71–280 and 71–284 is made the order of this Court. In invalidating the McDonough patent it is appropriate to indicate this Court's awareness of the increasing criticism being leveled at the federal judiciary for their harsh treatment of patents in recent years.[76]

---

74. See note 2, supra.

75. Defendant's Objection F.

76. See "The Inventor in the Courts: Confusion as a 'Standard' for Invention," by Logan R. Crouch, American Bar Association Journal Vol. 40, p. 103 [Feb. 1954].

See also "The Patentee v. The Copyrightee" by C. Harold Herr, p. 185. Copyright Law Symposium [ASCAP] New York, 1954 at p. 194:

"Indeed, to those interested in the patent profession, the increasing number of patents which are being knocked down by the judgment of the judiciary after having survived the prolonged and vigorous examination of the Patent Office is quite alarming. During the decade from 1936 to 1946 Federal Courts of the ten circuits defeated 85% of the patents brought before them. Between 1936 and 1941, ten out of eleven patents litigated before the U. S. Supreme Court were held invalid as lacking invention.' * * * During the last twenty years of the half-century just ended (1930–1950) the Supreme Court has reviewed thirty-four patent cases in which the issue of 'invention' was raised and decided. Of these thirty-four patents, all but six were held invalid for 'want of invention.' In four of these six exceptional cases, wherein the patents were held valid, considerable weight was accorded the findings of the courts below. It is significant that these few cases are the only ones in which a patent has been upheld since 1930. The remaining twenty-eight cases held that the patent in controversy was invalid for lack of 'invention.' Buckles, Property Rights in Creative Works—a Comparison of Copyright and Patent Laws, 32 J.Pat.Off.Soc'y 414, 428 (1950)".

The Herr quotation is not, of course, entirely in point in the instant case. The McDonough patent was *denied* by the Patent Office after seven years of examina-

**514**

This criticism is not justified in the instant case, for I am convinced that as to the patent in suit the evidence overwhelmingly supports the Master's conclusion.

tion, and granted by the District Court for the District of Columbia. (Defendant's Exhibit P-93.) Thus my ruling is

in accord not only with the Master's Report but with the conclusion of the Patent Office.