HELENE CURTIS INDUSTRIES, Inc.,
and Helene Curtis Sales, Inc.,
Plaintiffs,

C. V. Layden, doing business as South-
western Beauty Products Company,
Plaintiff-Intervener,

v.

SALES AFFILIATES, Inc., Defendant.

The GILLETTE COMPANY, Plaintiff,

Skillern & Sons, Inc. and Walgreen Drug
Company of Texas, Plaintiffs-
Interveners,

v.

SALES AFFILIATES, Inc., Defendant.

SALES AFFILIATES, Inc., Plaintiff,

The Procter & Gamble Company, Invol-
untary Plaintiff,

v.

C. V. LAYDEN, doing business as South-
western Beauty Products Company,
Defendant.

SALES AFFILIATES, Inc., Plaintiff,

The Procter & Gamble Company, Invol-
untary Plaintiff,

v.

SKILLERN & SONS, Inc., Walgreen
Drug Company of Texas, and The
Gillette Company, Defendants.

United States District Court
S. D. New York.
March 27, 1958.

Supplemental Judgment and Opinion
April 4, 1958.

Appeal Dismissed May 29, 1958.

Cravath, Swaine & Moore, New York City, for plaintiff, Bruce Bromley, New York City, of counsel.

Kenyon & Kenyon, New York City, for Helene Curtis Industries, Inc., and others, Theodore S. Kenyon, Malvin R. Mandelbaum, New York City, and Adolph A. Rubinson and Maurice S. Cayne, Chicago, Ill., of counsel.

Henry R. Ashton, New York City, for Gillette Co., Edgar H. Kent and Rynn Berry, New York City, of counsel.

Hawkins, Delafield & Wood, New York City, for Skillern & Sons, Inc. and Walgreen Drug Co. of Texas, Clarence Fried, New York City, of counsel.

Halpin, Keogh & St. John, New York City, for defendant, Sales Affiliates, Inc., Eugene J. Keogh, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

■ On April 30, 1954, this Court held, in a declaratory action between the parties to the instant proceeding, that defendant's U. S. Patent No. 2,577,-710 (hereinafter called "710") was invalid.[1] At that time, the defendant had a continuation-in-part application pending before the Patent Office. In January 1955, the defendant assigned that application to a Virginia Corporation, Tidewater Patent Development Company (hereinafter called "Tidewater"). On February 28, 1956, the application ripened into a granted patent, U. S. Patent No. 2,736,323 (hereinafter called "323"), and actions against plaintiffs' customers in Virginia were instituted by Tidewater charging infringement of the 323 patent by the sale of plaintiffs' products. Plaintiffs thereupon applied to this Court for an order holding defendant in contempt of the injunctive provisions of the 710 decree[2] and for an order expanding the scope of that decree to enjoin defendant from prosecuting the Virginia actions. They based their request for relief upon the contentions that the findings of fact and conclusions of law embodied in the 710 judgment necessarily render the 323 patent invalid as against the plaintiffs; and that Tidewater is controlled by the defendant so that Tidewater's actions are, in effect, those of the defendant.

On consent of the parties, the matter was referred to the Special Master who had heard the testimony and reported in the original action, Honorable Simon H. Rifkind, for findings on the issues of law and fact raised by the application. After lengthy hearings and thorough consideration, the Master reported that plaintiffs' allegations were correct. He nevertheless recommended that the relief sought be denied. On motion to confirm the Master's Report, I agreed that the facts did not warrant holding the defendant in contempt of the 710 decree and concurred in the Master's doubts regarding the power and propriety of this Court's enjoining the defendant from prosecuting the Virginia actions.[3] The Court of Appeals, while affirming the denial of the motion for contempt, held, by a divided court, that if the Master's findings with regard to plaintiffs' allegations are found correct, this Court would have power to grant a supplemental injunction.[4] It thereupon gave the following direction:

"* * * the case is remanded to the District Court to pass upon the findings of the Special Master. If the District Court should confirm the findings that 323 *is* invalid for substantially the same reasons that 710 was invalidated, and that Tidewater *was* a mere alter ago of Sales Affiliates, then the District Court should issue an appropriate supplemental injunction." (Italics added)[5]

1. D.C.S.D.N.Y.1954, 121 F.Supp. 490, affirmed, 2 Cir., 233 F.2d 148, certiorari denied 352 U.S. 879, 77 S.Ct. 101, 1 L. Ed.2d 80, rehearing denied 1956, 352 U.S. 945, 77 S.Ct. 260, 1 L.Ed.2d 240.

2. The 710 judgment provided, inter alia, that the
"* * * defendant, its agents, servants, employees, attorneys, privies and assigns be and they hereby are enjoined from bringing, prosecuting or threatening to bring or prosecute any suit charging infringement of any claim of United States patent No. 2,577,710 against plaintiffs or plaintiff-intervenor, or against any agent vendee or customer of any of them or against any others in privity with any of them."

3. D.C.S.D.N.Y.1957, 148 F.Supp. 340.

4. 2 Cir., 1957, 247 F.2d 940.

5. Id., 247 F.2d at page 946. In a memorandum decision date February 17, 1958, 159 F.Supp. 582, this Court construed the Court of Appeals' decision as freezing the issues at the time of the Master's Report and denied defendant's motion to take additional testimony. Thereafter, on March 19, 1958 the Court of Appeals concurred in the above interpretation in denying a motion by defendant to recall the mandate and clarify the opinion and judgment. 254 F.2d 470.

## I. Validity Of The 323 Patent

The validity of 323 is not to be determined as though this were a plenary proceeding. The plaintiffs are limited to showing that 323 is invalid for "substantially the same reasons" that 710 was invalidated, based upon the conclusions of law and findings of fact in the 710 litigation. The Master specifically limited himself to a determination of invalidity on this basis.[6] He therefore excluded the issue of fraud in the procurement of the patent as extraneous to the issues adjudicated by the 710 judgment.[7]

The 710 patent was a sub-generic patent laying claim to a vast class of mercaptan compositions used for the permanent waving of human hair. Although the inventor McDonough apparently originally viewed the 710 patent as one for a new composition of matter, i. e. mercaptans,[8] in view of the fact that a prior patent had specifically disclosed and claimed a species of mercaptan,[9] the defendant relied primarily upon the assertion that 710's validity rested upon the discovery that special laws and criteria govern mercaptans in hair waving.[10] The 710 patent was found invalid for, inter alia, non-criticality in fact, lack of invention over prior art, and indefiniteness in the statement of the claims.

Prior to the issuance of the 710 patent, but more than eight years after its filing date, the inventor filed a divisional application with the Patent Office which eventually issued as the 323 patent. The application claimed a small group of mercaptan compositions which had been disclosed in the specifications of the earlier 710 application. Among the mercaptans included within this smaller class is thioglycolic acid, which is the principal mercaptan used in commercial permanent waving compositions today.

In the Patent Office, the inventor of 323 was required to change the designation of his application from "divisional" to "continuation-in-part" owing to the examiner's contention that new matter had been inserted in the application. At the time, defendant's counsel vigorously disputed the contention that there was any new matter in the 323 application.[11] They now assert, however, that 323 does contain independent invention: the disclosure of "different criterion in the appreciation and selection of particular mercaptans for waving effectiveness."[12] The Master found, however, that "[C]omparison of the 323 patent with its parent, 710, reveals that the specifications of each are, save for minor additions and deletions, identical."[13]

Comparison of the specifications indicates that both contain the same general statement of the invention applied for, and the same teachings with respect to the pH of the mercaptan solutions, concentration, preferred bases and adjustment clause. While 710 referred to a broad class of mercaptans which included some 268 different mercaptans, 323's specifications are limited to a group containing some 46 mercaptans. The principal subject matter of 323, thiogly-

---

In its decision of March 19, 1958, the Court of Appeals also expressed irritation over the motions to delay the proceedings and instructed this Court to proceed forthwith in accordance with its opinion, 247 F.2d 940, filed on September 5, 1957. Since I am thoroughly familiar with the contentions of the respective parties, and the issues for determination have been fully briefed, further argument is unnecessary and I will decide the issues presented on the basis of the record before me.

6. The issue framed for trial by the Master was "Whether the findings of fact upon which the judgments in the 710 action rest require and compel a holding that the 323 patent is invalid."

7. 1956 Master's Report 25.

8. See 1954 Master's Report 27–8.

9. U.S. Patent No. 2,201,929 issued to Speakman on May 21, 1940.

10. But see note 17 infra.

11. Plaintiff's Exhibit 79, at page 91.

12. Defendant's Objections to Master's Report No. 2.

13. 1956 Master's Report 7.

colic acid, was referred to in 710 under the name of mercapto-acetic acid. There are three examples of the use of thioglycolic acid in the 710 patent, all of which are repeated in 323. The deletions from 710 relate to statements that polar acidic mercaptans—i. e., thioglycolic acid and its homologues, are less effective than other mercaptans.

The principal difference in the specifications relates to the language of the molecular weight instructions.[14] Defendant contends that the new language teaches for the first time that the structural formula of the mercaptan molecule, as well as its molecular weight, has an important bearing upon waving effectiveness. The defendant, however, urged in the 710 proceedings that 710 also taught the importance of structural formula, as well as molecular weight. I concur in the Master's analysis that:

"In 323 the inventor simply notes, as he did in 710, that waving effectiveness is related to molecular weight especially where the increase in weight results from the addition of a polar group. The only difference between the two specifications is the inclusion of the polar alkaline group as inducing this phenomenon in addition to the polar acidic group originally disclosed." [15]

The claims of 323, although limited to a smaller class of mercaptans, are virtually identical to the claims of 710. The Master's findings on this point are unassailable.

"Thus, the broadest claims of 323 limit the mercaptan concentration range from 'about 2% to 10%', whereas in 710, the concentration range is from about 1% to 10%. In both instances, the concentration limits are derived from the examples set forth in the specifications. Likewise, the 323 claims do not contain any limitation with respect to molecular weight 121, which was found in the 710 claims; inasmuch as all species claimed in 323 are below molecular weight 121, such a limitation would of course be superfluous.

"Further, some of the claims of 323 (e. g. 1, 2 and 13) are limited to the use of ammonium hydroxide as a base, a limitation nowhere found in the claims of 710, although ammonium hydroxide was there used in the disclosed examples. However, the majority of 323's claims specify a base having a dissociation constant of less than $5 \times 10^{-3}$, a limitation also found in 710. Some 323 claims (e. g., 20, 24 and 25) require an alkaline material having a dissociation constant of about $10^{-5}$. This limitation, too, is to be found in some 710 claims. (e. g., 10 and 11).

---

14. In 710 the inventor taught that:
"I have also discovered that as the molecular weight increases, the mercaptan becomes less effective as a waving agent, particularly if the increase is due to a polar acid group. For example, beta-amino ethyl mercaptain (molecular weight 77) is far more efficient as a waiving agent than cysteine (molecular weight 121) which is molecularly heavier and contains the polar carboxyl group in addition to the polar amino group."
In 323 this paragraph has been rewritten as follows:
"I have also discovered that as the molecular weight increases, the mercapto-alkanoic acids become less effective as waving agents, particularly if the increase is due to a polar acid group or to a polar alkaline group. For example, in the homologous series of simple mercapto-alkanoic acids, mercapto-acetic acid is more effective than mercapto-propionic acid which in turn is more effective than mercapto-butyric acid; and the simple mercapto-alkanoic acid, mercapto-hexanoic acid, is far more effective than the dicarboxylic acid, thiomalic acid, although these two mercaptans have almost identical molecular weights; and mercapto-butyric acid is far for [sic] efficient as a waiving agent than cysteine which has almost the same molecular weight but contains the polar alkaline group, the amino group, in addition to the polar carboxyl group."

15. 1956 Master's Report 9.

"The pH ranges of 323 are substantially the same as those found in 710. Thus, we find the preferred commercial range 'from about 9.2 to not higher than pH 9.5' in claims 3, 10, 12, and 16 (compare, e. g., claim 3 of 710). In those claims containing the adjustment clause (e. g., 4–7, 8, 9, 15), the range is 'higher than pH 7 and not higher than pH 9.5'. The only new pH is to be found in claim 19 where it is stated to be 'about 9'. This claim, however, appears to have been framed by the Examiner for the interference proceeding.

"In sum, the claims of 323 follow the teachings of the specifications as to pH, base and concentration in precisely the same manner as those in 710." [16]

Since the "critical" factors disclosed in 323 are identical to those disclosed in 710, if 323 is a criticality invention it must necessarily be invalid for these factors were held to be non-critical in fact in the 710 action.[17] The defendant was therefore constrained to maintain in this proceeding that invention in 323 does not depend upon criticality but rather upon the discovery of new and useful compositions of matter for permanent waving—i. e. that 323 is a species patent. It was similarly contended before the Court of Appeals in the 710 case, that 710 was for a new combination of matter—mercaptans having a molecular weight less than 121.[18] The contention was of no avail to the defendant in that action and was rejected by the Master in this proceeding.

"In 323, as in 710, McDonough discloses and claims not a species invention, but the same criticality invention which he disclosed and claimed in 710 and which was found wanting in the prior proceeding."[19]

The evidence supporting the Master's conclusion is overwhelming. Not only did the defendant contend before the Patent Office that the patent should be granted because of the discovery of critical factors,[20] but there is every indication that the patent was eventually issued on this very basis.[21] The Master

---

16. 1956 Master's Report 10, 11.

17. In fact, some of the tests relating to criticality in the 710 proceedings were performed with thioglycolic acid. See 1954 Master's Report 35.

18. See Plaintiffs' Brief 17; Plaintiffs' Appendix 461–62. The molecular weight limitation was designed to avoid the Speakman patent which disclosed a mercaptan, cysteine hydrochloride, which has a molecular weight of 121.

19. 1956 Master's Report 14.

20. The defendant submitted the same Goldrick, Snell and Berdick affidavits in support of 323 as had been used to establish a criticality invention in 710. It also stated its position as to patentability of 323 before the Patent Office as follows:

"Our basic position here is that the invention of the present case constituted the discovery of four things which, combined together, give a waiving solution which is better than anything in the prior art as a matter of kind rather than of degree.

The four factors constituting the invention are the discovery and selective combination of:

"(1) a highly critical and restrictive pH range;

"(2) a critical and relatively very low mercaptan concentration range;

"(3) bases of certain critical and highly important characteristics; and

"(4) a specific type of mercaptan.

"The present application is devoted to covering one highly effective subgroup of mercaptans in combination with the other three factors listed.

"The applicant discovered that mercaptans do not work on the high pH basis emphasized by Speakman."

\* \* \* \* \*

"In effect applicant's discovery of this critical range of the pH control for mercaptans is a basic ground for allowing patent claims thereon. The law is quite uniform in supporting the contention that the discovery of the critical range over other ranges or within a broad range is clearly patentable."

21. The Board of Patent Interferences,

correctly disposed of the defendant's contention as follows:

"Having sought issuance of the patent on the ground of a 'criticality' invention, the defendant cannot change horses in midstream. It will not do to urge, as the defendant does, that the patent might have been issued by the Patent Office on some other ground; such a contention is not only unsound in law, but in fact as well."[22]

The finding of non-criticality in fact in the 710 proceeding compels a holding that 323 is invalid.

The findings with regard to the invalidity of 710 because of lack of invention over prior art are equally binding upon the defendant in this proceeding. Since the 323 invention is based upon criticality, defendant's contention that it is entitled to a pre-filing invention date must be rejected as it was in the 710 litigation. Even if the invention rests, as the defendant contends at one point, upon the disclosure of the importance of the structural formula of mercaptan molecules and the value of polar acidic mercaptans, the 710 findings clearly indicate that the defendant had not made such a discovery until after the filing date of the 710 application.[23] Moreover, even if invention is based upon the "discovery of a new composition of matter," and even if the defendant were entitled to a pre-

filing date for 323, it is difficult to see how the defendant could avoid Speakman's Canadian Patent No. 365, 290 and the depilatory art in which the use of thioglycolic acid is specifically disclosed. If 323 is not entitled to a pre-filing date, even if it were for a new composition of matter, the Vago article of 1937 specifically referring to thioglycolic acid, and the Grant, Reed and Will at reductions of thioglycolic acid to practice, would prove fatal.

On the further ground of indefiniteness in the statement of the claims, the holding in 710 requires a finding that 323 is invalid. As the Master found:

"Practically all of the expressions to which exception was taken in 710 are to be found in the claims of 323. Thus one of the expressions singled out by the Court of Appeals was the concentration limit of 'about six per cent' found in claim 18 of 710. The same expression appears in claims 2, 4, 5, 6, 7, 9, 10, 12, 13, 16, 17, 19, 23 and 25 of 323. In its new context the expression imports no more certainty with respect to the limits of the claims than it did in its old. Actually every statement of mercaptan concentration in the claims of 323 is prefaced by the same qualifying language which was found objectionable in 710.

in awarding priority of invention to McDonough over Martin stated:

"No one reading the said Martin specification, not even one skilled in the art, would, in our opinion, validly obtain any impression that a pH between 7 and 9.5 in relation to the required ingredients, *the very heart of the invention*, was an agency in this process * * *. Consciousness of this *critical central concept and main guiding factor upon which patentability depended* and a clear teaching thereof is a minimum consideration for finding supporting disclosure for the counts."

22. 1956 Master's Report 16, 17.

23. Thus, the 710 application and patent taught that thioglycolic acid was not a

particularly effective mercaptan. The 1954 Master's Report at pages 42–43 detail McDonough's experiments with thioglycolic acid in 1941. They were marked by poor results. "McDonough thereupon abandoned the use of thioglycolic acid, except for a few experiments which seemed to confirm his previous disappointing results with this mercaptan." At page 82 of the 1954 Report, the Master stated: "Moreover, it must be remembered that McDonough—for all of his experimentation—arrived at the conclusion that thioglycolic acid, now the only mercaptan used in permanent waving—was not as satisfactory for waving as glyceryl monomercaptan, which has practically disappeared from commercial use."

"The Court of Appeals likewise found that the statement of the pH range, 'from about 9.2 to not higher than 9.5', in the claims of 710 was fatally ambiguous. Precisely the same formulation appears in 17 of the 25 claims in suit."[24]

I fully concur with the Master's conclusion that, "for the purposes of this proceeding, 323 must be deemed invalid by virtue of the findings of fact and conclusions of law embodied in the 710 judgment."[25]

## II. Status of Tidewater

The second allegation upon which plaintiffs' application for a supplementary injunction is based is that Tidewater is controlled by Sales Affiliates and that the actions of Tidewater are the actions of the defendant. The defendant contends, however, that when 323 issued Tidewater was a completely independent corporation and continues to be free of any control by the defendant. The Master found Tidewater to be "the alter ego of the defendant * * * a corporate shell whose sole function is to endow the defendant with an artificially created domicile for the purposes of litigation."[26] While direct evidence is slight, all of the overt formalities of corporate independence having been scrupulously observed, the circumstantial evidence supporting the Master's conclusion is overwhelming.

In January 1955, while an interference proceeding on the 323 application was pending in the Patent Office, the defendant caused Tidewater to be formed for the express purpose of avoiding this Circuit.[27] Redfern, a Virginia attorney who was employed by the defendant in a professional capacity and was a friend of the Evans family and a consultant to it on patent matters, was instructed by defendant's house counsel to sever his relations with the defendant and form Tidewater. The Certificate of Incorporation was signed by Redfern, his law partner and a secretary in his office. They are the corporation's directors; it has no other employees.

On January 11, 1955, Tidewater issued 2,000 shares of its stock to the defendant in return for an assignment of the then pending continuation-in-part application plus $2,000 in cash. The defendant reserved to itself, under the terms of the assignment, the right to a license when and if the application should mature into a patent. This option was exercised when the patent issued. Defendant also reserved its rights to all royalties under its existing license agreements which covered 710, the 323 application and four other patents, without allocation of royalties. Tidewater agreed not to bring infringement actions against defendant's licensees.

While the defendant was sole stockholder its complete control of Tidewater was too transparent.

"To cloak Tidewater with some colorable basis of independence, Evans brought his son's stepfather-in-law, a Kansas City businessman named Kinney, into the picture. This was accomplished by means of a 10 or 15 minute telephone call to Kinney, as a result of which Kinney purchased defendant's 2,000 shares of Tidewater stock for $10,000. The transaction was consummated on January 14, 1955."[28]

---

24. 1956 Master's Report 18–19.

25. 1956 Master's Report 19.

26. 1956 Master's Report 22.

27. The defendant's president, Dr. Evans, freely acknowledged this objective:
"The Master: In other words, you formed the corporation to have another entity which would have jurisdictional residence or domicile close to the District of Columbia; is that right?

The Witness: We wanted it either in the Fourth Circuit or the District of Columbia.
The Master: You wanted to stay away from New York?
The Witness: That is right."
Transcript of Proceedings Before Special Master, p. 212.

28. 1956 Master's Report 20.

The defendant contends that since the sale to Kinney it has exercised no control over the actions of Tidewater. The facts, however, indicate otherwise. Firstly, genuineness of Kinney's ownership is dubious at best. Kinney had shown little inclination to find out what he purchased or to exercise any measure of control over Tidewater's activities. He made no attempt to find out about the patent complications; he was completely ignorant of the reservation of existing license rights to Sales Affiliates, of its reserved license option or of any other aspect of Tidewater's financial status or sources of income. He was not consulted by Redfern with regard to the commencement of the Virginia suits, the only corporate activity taken thus far, but was advised ex post facto.

> "If Kinney's ownership is truly bona fide, his confidence in an attorney whom he has never met or heard of prior to his association with the enterprise and whom he has seen on only two or three occasions since is truly remarkable."[29]

Even if Kinney's ownership was genuine, however, this does not negate control by the defendant. The form of the transaction—formation of a "dummy" corporation and stock transfer to Kinney within one week thereof, rather than outright assignment to Kinney—suggests that the defendant sought to retain the continuity of Redfern's representation. The Master characterized him as follows:

> "Redfern, who until a few days prior to the formation of Tidewater was Evans' counsel, is Tidewater's chief and only executive officer. Having participated as a member of

Evans' patent policy committee, he is wholly familiar with the objectives Evans sought to be accomplished by the formation of Tidewater and certainly has not been remiss in directing Tidewater's fulfillment of those goals."[30]

Moreover, Tidewater's only activity since the patent issued had been the institution of infringement actions against plaintiffs' customers in Virginia.

> "The affairs of Tidewater, in other words, are largely in the hands of its patent counsel. Yet, we find Tidewater's attorneys * * * are the same attorneys who represented the defendant in the prosecution of the 710 patent through the Patent Office and in the litigation on 710, as well as in the present proceedings."[31]

Tidewater's only source of income was from Sales Affiliates' royalty payments under its license from Tidewater. The first royalty payment for the period of one month and two days was $10,281.09 and the anticipated annual payment is in excess of $100,000. Certainly a substantial return on Kinney's investment.[32] These payments were being made although it is extremely doubtful that the defendant had need for a license from Tidewater.[33] The implication that they were really being paid to finance the 323 litigation is difficult to avoid.

While any one of these factors taken singly might be insufficient to warrant a finding that Tidewater is the alter ego of the defendant, when considered together they inescapably compel the conclusion that Tidewater was controlled

---

29. Id. at 22.

30. Ibid.

31. Ibid.

32. Were Tidewater actually independent it might be well advised not to contest the validity of the patent after a short period of delay, take the tremendous return on the initial investment and avoid the litigation expenses which might well drain all of its income. This might be a par-

ticularly sound approach since the 710 litigation should at least indicate to the prudent businessman or his attorney that the chances of 323 being held valid are extremely slight. The defendant, on the other hand, has a strong interest in seeing 323 litigated to the bitter end. An attorney who represents both parties might be confronted with a substantial conflicts of interest problem.

33. 1956 Master's Report 21.

and manipulated by the defendant for its own purposes.

In accordance with the direction of the Court of Appeals to pass upon the Master's findings as to the validity of 323 and Tidewater's control, I find that 323 is invalid for substantially the same reasons that 710 was invalidated and that Tidewater was a mere alter ego of Sales Affiliates. Consequently, as to these findings of fact the plaintiffs' motion to confirm the Master's findings is granted and a supplemental injunction as prayed for will issue. Settle supplemental injunctive order promptly.

### Supplemental Judgment
### (C 71–284)

This cause having come on to be heard on motion by plaintiff and plaintiffs-intervenors for modification and confirmation of and on defendant's objections to the report of Simon H. Rifkind, Special Master, filed November 9, 1956, the issues having been fully briefed and submitted to this Court by both sides, the Court having passed upon the findings of the Special Master pursuant to the judgment of the United States Court of Appeals dated and filed September 5, 1957 and the final order entered thereon by this Court on November 6, 1957, and the Court on March 27, 1958, on all the proceedings and supplemental proceedings heretofore had herein, having ordered entry of supplemental judgment thereon, it is

Ordered, Adjudged and Decreed as follows:

1. As used in this judgment:

(a) "Plaintiffs" include plaintiff and plaintiffs-interveners, or any of them.

(b) "Person" includes an individual, partnership, firm, association, corporation or other business or legal entity.

(c) "Defendant's privies and assigns" includes (1) each and all assignees or other persons in privity with defendant, with respect to U. S. patent No. 2,577,-710, U. S. patent No. 2,736,323, the respective applications therefor, or all or any part of the alleged invention disclosed or claimed therein, (2) any person controlled by defendant or by any of the foregoing, (3) any officer, agent, servant, employee, or attorney of the defendant or of any of the foregoing, and (4) any privy or assignee of any of the foregoing.

(d) "Plaintiffs' privies" includes each and all agents, vendees and customers of plaintiffs, plaintiffs' successors and assigns, and any other person in privity with plaintiffs or with any of the foregoing, and all persons selling or using plaintiffs' products.

2. The provisions of this judgment shall apply to and be binding upon defendant, defendant's privies and assigns, and upon each and all persons in active concert or participation with defendant or defendant's privies and assigns who receive actual notice of this judgment by personal service or otherwise.

3. Except in so far as the portions of said report with respect to plaintiffs' right to relief have been modified by the judgment of the United States Court of Appeals dated and filed September 5, 1957, and the final order entered thereon by this Court on November 6, 1957, said report is confirmed in all respects, and the findings of fact and conclusions of law of the Master as so modified are hereby adopted as those of the Court, and, together with the findings of fact and conclusions of law of this Court as stated in its opinion of March 27, 1958, are embodied in and made a part of this judgment.

4. The alleged invention described and claimed in U. S. patent No. 2,736,323, and each and every claim of said patent, are invalid and void and are unenforceable against plaintiffs or against plaintiffs' privies.

5. As to each and all persons to whom this judgment is applicable, (1) plaintiffs, their successors and assigns are free to make and have made for them, use and sell any product of any kind, and (2) plaintiffs' agents, vendees and customers, and all persons using or selling any product made by or for plaintiffs,

their successors or assigns, are free to use and sell such product, all without liability for infringement or payment of royalties or any other demand with respect to all or any part of the alleged invention disclosed or claimed in U. S. patent No. 2,577,710 or U. S. patent No. 2,736,323.

6. Each and all the persons to whom this judgment is applicable, be, and they hereby are, enjoined from bringing, maintaining, prosecuting or threatening to bring or prosecute, or assisting in the prosecution of any suit charging infringement of all or any part of the alleged invention disclosed or claimed in U. S. patent No. 2,577,710, or U. S. patent No. 2,736,323, against plaintiffs or against plaintiffs' privies, including the following civil actions now pending in the United States District Court for the Eastern District of Virginia, Norfolk Division: Tidewater Patent Development Company, Inc. v. Rex Beauty Supply Co. Inc., Civil Action No. 2173, filed February 28, 1956; Tidewater Patent Development Company, Inc. v. Peoples Service Drug Stores, Inc. and Peoples Drug Stores, Inc., Civil Action No. 2174, filed February 28, 1956;

or otherwise interfering or threatening to interfere with the rights of plaintiffs and plaintiffs' privies as adjudged and declared herein.

7. Plaintiffs shall recover from defendant their costs in this action, including their payment of the fees of the Special Master herein, to be taxed by the Clerk of this Court and made a part of this judgment.

## Opinion

Sales Affiliates, defendant in actions C71–280 and C71–284 and plaintiff in actions C76–375 and C76–376 objects to Paragraph 7 in each of the proposed supplemental judgments taxing it for costs including payment for the Master's fee.

The order of reference dated May 12, 1956 as did the order, dated June 13, 1952, provided that "each party shall pay one-half of the Master's fees, which shall be taxed as costs against the losing party or as the Court may direct." Rule 54(d) Fed.Rules Civ.Proc. 28 U.S.C.A. also states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." While it is true that the plaintiffs in actions C71–280 and C71–284 and defendants in actions C76–375 and C76–376 did not sustain so much of their prayer for relief which sought an order punishing Sales Affiliates for contempt of court, they were successful in that part of their application which sought the supplemental injunctive provision. It is clear that they are the successful parties as a result of prevailing in their efforts to obtain the supplemental injunctive provision. See Hines v. Perez, 9 Cir., 1957, 242 F.2d 459, 466; Ryan v. Arabian American Oil Co., D.C.S.D.N.Y.1955, 18 F.R.D. 206, 207; 6 Moore, Federal Practice § 54.70(4) (2d ed. 1953).

It is significant that the costs of the several proceedings in the Court of Appeals for the Second Circuit were taxed by that court against Sales Affiliates. On the motion of Sales Affiliates, for a revision of the taxation of costs upon the last appeal which resulted in a direction that injunctive provisions issue if the Master's findings were correct, the court stated: "As to the taxation of costs, it is clear that the great bulk of the record and briefs were directed to the issues on which the appellants prevailed." 2 Cir., 1957, 247 F.2d 946.

Paragraph 7 in each of the proposed supplemental judgments is proper.