**TIDEWATER PATENT DEVELOP-
MENT COMPANY, Incorporated, Appellee,**

v.

**K. M. KITCHEN and Virginia M. Kitchen, partners trading as K. M. Kitchen Beauty Supply Company, Appellants.**

**No. 10463.**

United States Court of Appeals
Fourth Circuit.

Argued June 21, 1966.

Decided Nov. 29, 1966.

On Rehearing Feb. 14, 1967.

Samuel J. Stoll, New York City (Richard B. Spindle, III, Willcox, Cooke, Savage & Lawrence, and Willcox, Savage, Lawrence, Dickson & Spindle, Norfolk, Va., on brief), for appellants.

George B. Finnegan, Jr., New York City (William D. Denson, Albert H. Brodkin, New York City, and Penn, Stuart & Miller, Abingdon, Va., on brief), for appellee.

Before BOREMAN, BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

A patent for a permanent hair waving solution and method was upheld, and declared infringed, in the District Court at the suit of the owner, Tidewater Patent Development Company, Inc. against the partnership of K. M. Kitchen Beauty Supply Company. Defendants appeal and we reverse, finding the patent invalid.

In our judgment the patent in controversy (i. e. the six claims in dispute), known as No. 323, not only is void as duplicative of Tidewater's earlier patent, known as 710, but 710 aside, invention therein is virtually disavowed. It is duplicative because its core is the use of thioglycolic acid and ammonia in a solution of stated concentrations, when these factors were not only disclosed but claimed in the earlier patent. Invention, anyway, is not proved, for the use of

these materials in hair-waving is not shown to be new, and criticality in the concentration was not established.

Patent 323 was issued on February 28, 1956 as No. 2,736,323, upon the application of Everett G. McDonough filed August 13, 1949. Only Claims 1, 13, 14, 17, 18 and 22 are in question. This patent was issued as a continuation-in-part of a copending application, filed June 16, 1941 and resulting in patent 710 supra, that is No. 2,577,710, issued on December 4, 1951. The latter patent is classified as a generic patent relating to hair waving, while 323 is designated as a species patent. By assignment these patents ultimately became the property of Tidewater.

### Res Judicata

The Patents were the subject of extensive litigation in the Southern District of New York and in the Court of Appeals for the Second Circuit. Each patent was declared invalid, first 710 and then 323 as dependent upon it, in Helene Curtis Industries, Inc. v. Sales Affiliates, Inc. and consolidated causes. Those embracing 710 are reported in 105 F.Supp. 886 (D.C. 1952) (referral to Special Master, multiple suits enjoined), affirmed 199 F.2d 732 (2 Cir. 1952); opinion of Special Master adopted invalidating 710, 121 F.Supp. 490 (D.C. 1954); motion for new trial denied, 131 F.Supp. 119 (D.C. 1955), affirmed 233 F.2d 148 (2 Cir. 1956), cert. den. 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956). The decisions embodying 323 will be found in 148 F.Supp. 340 (D.C. 1957) (injunction against enforcement of 323 denied); reversed and remanded, 247 F.2d 940 (2 Cir. 1957); motion to take additional testimony denied, 159 F.Supp. 582 (D.C.1958); motion for clarification denied, 254 F.2d 470 (2 Cir. 1958); and 161 F.Supp. 345 (D.C. 1958) (323 invalid, injunction against enforcement granted).

We are urged to dispose of this case upon a plea of res judicata or judgment by estoppel—that the New York decisions are conclusive here. The point made is that Tidewater is the alter ego of Sales Affiliates, Inc., a party to each of the actions in New York as the owner of the patents. In reply, Tidewater says that assuming it does occupy that position, despite its denial, the argument for res judicata or estoppel cannot succeed because of the holding in Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936). The reason urged is that the appellant-defendants are not sued for distribution of the products of any party adversary to Sales Affiliates in the New York suits. As we find the patent invalid in itself, we have no occasion to rule on the effect here of the New York decisions.

■■ The present cause was sent by the District Judge to a master. His report sustained 323, and in this he was confirmed by the District Judge. Without disparaging in the slightest their care and study, we agree, as comity permits, with the Second Circuit in its invalidation of 323 on the grounds, at the least, of double patenting and absence of proof of invention. Triplett v. Lowell, supra, 297 U.S. 638, 642, 56 S.Ct. 645, 80 L.Ed. 949. As the criteria governing patentability are standards of law, and since the decision of the District Court was largely based on documentary evidence, in not following the conclusions of the trial court we are not offending the "clearly erroneous" precept of Rule 52(a) F.R.Civ.P. Nicholson v. Carl W. Mullis Engineering & Mfg. Co., 315 F.2d 532, 536 (4 Cir. 1963); Noe v. Smith, 300 F.2d 430, 431 (5 Cir. 1962); Iravani Mottaghi v. Barkey Importing Co., 244 F.2d 238, 248 (2 Cir. 1957), cert. den. 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538.

### The Process Generally

Permanent waving is, of course, dependent upon the reduction to plasticity of the hairs of the head. A molecular substance known as keratin exists in each strand and furnishes its fibrous character, that is its body and strength. The molecules are arranged in longitudinal cords, consisting of long organic chains rigidly joined by many transverse link-

ages. Each linkage may be envisioned schematically as a union of two sulfur atoms, each atom attached to a different longitudinal chain. Such connections are called disulfide links. To obtain plasticity of the hair they must be weakened or broken so that the longitudinal chains may slide among each other without stress. The reaction accomplishing this result may be generally classified as a chemical reduction. Then, when the artificially pliable hair has been mechanically curled, the bonds must be replaced to "set" the hair and restore its strength. An oxidizing reaction is used to achieve this end.

At first, waving was obtained by the application of a softening borax or ammonia solution to the hair, after or before it had been mechanically wound, so that the curls were wet while wound. Heat was applied. Then the hair was rinsed and the mechanical curling agents, e. g. mandrels or curling irons, were removed, the hair retaining the wave given it by the winding. The principal disadvantages of this now outmoded process were that it required costly and cumbersome mechanical aids as well as heat capable of causing severe scalp burns.

Beginning in the late 1930's, trials were commenced with "cold waving" sulfite and sulfide reducing solutions. These proved unacceptable because the sulfites required excessive time to reduce the transverse bonds and both sulfites and sulfides liberated hydrogen sulfide, a poisonous gas with the strongly offensive odor of rotten eggs which was capable of causing asphyxiation when applied in a booth or cubicle of a beauty salon. It was in this state of things that McDonough filed his application in 1941 for patent 710, which he asserts embodied discoveries made as early as 1937.

### Double Patenting of 710 by 323

Claim 18 in 323 is descriptive of the asserted invention and typical of the claims in suit. It reads:

"The method of permanently changing the configuration of hair on the living human scalp without damage to the hair structure, including the steps of imparting the desired configuration to the hair and treating of the hair with a permanent waving solution comprising ammonia and an amount of thioglycolate equivalent to about 2% to 10% of *thioglycolic acid*, said solution having a pH between 7 and 9.5, and then fixing said configuration." (Accent added.)

That such claims of 323 were foreshadowed by those of 710 becomes apparent as we examine the earlier 710 in detail.

The disadvantages of pre-1941 art, 710 purportedly discovers, can be overcome by the use as a waving agent of one or more mercaptans containing substituted polar or nonpolar groups. The employment of mercaptans was the thesis of the patent. A mercaptan is defined as "any of various compounds with the general formula RSH that are analogous to the alcohols and phenols but contain sulfur in place of oxygen and often have disagreeable odors". Webster's Seventh New Collegiate Dictionary (1963). "S" and "H", of course, represent the sulfur and hydrogen atoms. "R" indicates any organic group. Among examples given in 710 of a mercaptan is mercapto-acetic acid, which is thioglycolic acid (T-acid herein) and, as emphasized supra, the principal component of the 323 solution.

Patent 710 describes how these mercaptans are effective as hairwaving agents when used in a solution with a concentration "usually less than 15%". The pH range of the solution, it is said, should be "from 7.0 to 10.0, the preferred pH being about 9.2". The symbol pH expresses the acidity or alkalinity of a solution. Its measurements run from 0 to 14. In this scale 7 indicates neutrality. As the numbers proceed from 0 to 7 they represent decreasing acidity; as they go above 7, they represent increasing alkalinity.

To adjust the acidic solution to the proper pH, 710 directs the use of bases, including among others, aqueous ammonia, also a component of the 323 solution. Different concentrations and pHs are recommended when hot and cold wave

procedures, respectively, are employed. The following representative claim was asserted:

"1. A permanent waving composition comprising a mercaptan having a molecular weight less than 121 and having the general formula R—SH, where the organic group R contains a carbon atom attached to the sulfur atom, said mercaptan having a vapor-pressure-depressing substituent in the organic group R, in a solution containing an alkaline material having a dissociation constant less than $5x10^{-3}$, said solution having a pH higher than pH 7 and not higher than pH 9.5, the concentration of said mercaptan in terms of weight per volume ranging between about 1% and about 10%, the concentration of mercaptan and the pH of the solution being adjusted within said ranges to obtain a permanent change in the configuration of human hair during a given time of application without damage to the hair structure by having the concentration of mercaptan in the higher portion of said concentration range for a lower pH and having the concentration of mercaptan in the lower portion of said concentration range for a higher pH within the stated pH range."

Claims 2, 3 and 4 vary from 1 only in that they speak of slightly different pH's and mercaptan concentration. Some use the term "alkaline material" and others its synonym "base". Claim 3 describes a volatile base of the same dissociation constant. Claim 5 covers a "non-ionizing" substituent, which, contrary to the others, would exclude T-acid, but features a base of the same dissociation constant. Claims 17 and 18, too, are quite similar to Claim 1. Other pertinent claims are:

"6. A composition as specified in claim 1 wherein the vapor-pressure-depressing substituent is an ionizing group.

"7. A composition as specified in claim 1 wherein the vapor-pressure-depressing substituent is an acidic group."

* * * * * *

"10. A composition as specified in claim 1 wherein the dissociation constant of the alkaline material is about $10^{-5}$.

"11. A composition as specified in claim 3 wherein the dissociation constant of the alkaline material is about $10^{-5}$."

* * * * * *

"13. A composition as specified in claim 3 wherein the vapor-pressure-depressing substituent is an ionizing group.

"14. A composition as specified in claim 3 wherein the vapor-pressure-depressing substituent is an acidic group."

### Similarity of 323

Tidewater concedes that the invention claimed in 323 was disclosed in 710, but it denies that any claims therefor were asserted in 710. This denial we think is untenable. No one cognizant of the art can read the two patents without immediate recognition of the identity. The specifications in each are frequently parallel. The pH ranges are the same, as are the concentration percentages.

We cannot agree with the holding of the District Court that 710 does not claim, as does 323, T-acid and ammonia. While 710 does not favor the use of T-acid, it certainly claims its use generally. The coincidence of the claims of 710 and those of 323 clearly appears in the Claims 1–4, 6–7, 13–14, and 17–18, of 710, described supra in relevant part, for T-acid fits into the prescription of each of them.

Turning to the representative claim of 710, No. 1, supra, it will be seen that it first prescribes a "mercaptan having a molecular weight less than 121 and having the general formula R-SH where the organic group R contains a carbon atom attached to the sulphur atom". T-acid, the major ingredient of 323, is a mercaptan with a molecular weight of 92. In columns 3 and 5 of the 710 specification it is stated that the "R" group of a mercaptan may be either "simple" (com-

posed merely of carbon and hydrogen) or may contain, as does T-acid, other "substitute" groups (substituting other elements where only carbon and hydrogen appear in a "simple" mercaptan). T-acid is a relatively simple mercaptan ($SH_3CCOOH$), with a COOH group of carbon, oxygen and hydrogen known as the carboxyl group.

Next, Claim 1 prescribes that "said mercaptan [have] a vapor-pressure-depressing substituent in the organic group R". The specifications, 5–59, state that by this substituent "is meant a substituted mercaptan which contains in its organic group R either a polar (ionizing) group or a non-polar (non-ionizing) group of the type above described * * *." T-acid is polar, ionizing and acidic. The patent states that "either polar or non-polar groups are within the spirit and scope of this invention."

Then Claim 1 directs that this substituted mercaptan be contained "in a solution containing an alkaline material having a dissociation constant less than $5 \times 10^{-3}$, said solution having a pH higher than pH 7 and not higher than pH 9.5, the concentration of said mercaptan in terms of weight per volume ranging between about 1% and about 10%, the concentration of mercaptan and the pH of the solution being adjusted within said ranges to obtain a permanent change in the configuration of human hair * * *." True, ammonia is not mentioned by name as it is in 323, but it is comprehended in the solution just described in Claim 1, for it is an "alkaline material having a dissociation constant less than $5 \times 10^{-3}$". It is more narrowly circumscribed in Claims 10 and 11 where "the dissociation constant of the alkaline material is about $10^{-5}$". It is also identified in the specifications, 4–69, when they include ammonia among the "alkaline materials, * * * satisfactory for adjusting these pH's".

Finally, as "illustrations of waving solutions using the new waving agents according to this invention" the patent gives as "EXAMPLE 1, *Polar type—Acidic*" the three components of the 323 solution: mercapto-acetic [T-acid], ammonium hydroxide [ammonia in water] and water.

■ Proof of double patenting is found in the concession of Tidewater that any product made under 323 would infringe 710. This concession appears explicitly at page 14 in Tidewater's response to appellant Kitchen's exceptions to the master's report. It is implicit in the testimony of Tidewater's president to the effect that his company acquired 710 to assure protection of its 323 licenses against accusations of infringement of 710. True, 710 may be pursued without infringing 323. This is so, however, only in reference to those claims of 710 not copied in 323. "Double patenting may exist even where, as here, the claims in two cases are not mutually cross-readable. * * *" Application of Zickendraht, 319 F.2d 225, 229, 50 CCPA 1529 (1963).

■ Of course, as we said in S. H. Kress & Co. v. Aghnides, 246 F.2d 718, 726 (4 Cir. 1957), an owner is not barred from claiming as inventions in a second patent unclaimed disclosures appearing in an application previously filed by him and still not made public. However, this principle does not obtain unless the second patent is for a different invention from that *claimed* in the first. Hence *Aghnides* gives no support for 323.

Nor do we think that 323 was held, as Tidewater argues, in Tidewater Patent Development Co. v. Gillette Co., 273 F.2d 936, 939 fn. 1 (4 Cir. 1960) to be a patent differing from 710. In speaking of these two patents Judge Soper said, "There are substantial differences between the two formulae. * * *" Of course, there are differences, for 710 embraces many substituted mercaptans, while 323 embodies only one, T-acid. Moreover, Judge Soper was speaking on an appeal in an interference proceeding, and the opinion stresses that the validity of the two patents is not therein adjudicated—decided only is the priority of discovery as between McDonough and one Martin.

For a species patent to escape conviction as a double patent of one or more claims in the genus patent, the species must represent a "distinct, different and separable invention". This Circuit, in a case not dissimilar to the present one, through Judge Soper, stated this proposition in terms quite apposite here. Remington Rand Business Service, Inc. v. Acme Card System Co., 71 F.2d 628, 633–634 (4 Cir. 1934). So apt are his words and quotations that they are worthy of repetition at length:

> "The second Powell patent * * * we think is invalid for double patenting, since it covers the same invention as that disclosed in the first Powell patent. The drawings are identical and the descriptive parts of the specification are substantially the same. * * * "

> * * * * * *

> "The rule as to double patenting is clearly stated in Century Electric Co. v. Westinghouse [8 Cir.] 191 F. 350, 352, as follows: 'An inventor, it is true, may not sustain a subsequent patent for an invention actually claimed and secured in a former patent. * * * Nor may he sustain a subsequent patent for an essential element of an invention secured by a former patent without which that invention would not have been patentable. * * * But one who makes several patentable inventions * * * may have as many separate valid patents as he makes patentable inventions. His is the option to secure all these inventions by a single patent, or by many patents, and the fact that he describes all of them in his application or specification for an earlier patent to secure one or more of them, does not invalidate a subsequent patent to him for those inventions there described but not claimed. * * * And a patent for an invention does not avoid a later patent for an improvement thereon nor does a patent for an improvement avoid a later patent for the invention on which the improvement is made. * * * The sum of the whole matter is that while an earlier patent avoids a later patent to the same patentee for the invention claimed and secured by the former it does not invalidate a later patent to him for a distinct, different and separable invention whether generic or specific, whether an original machine or process, or both, or an improvement thereon which is not actually claimed or secured by the earlier patent.'

> "See, also, Gibbs v. Montgomery Ward & Co. [4 Cir.] 27 F.(2d) 466; Id. (D.C.) 19 F.(2d) 613. This situation was recognized by the District Court, but the patent was sustained because it was issued upon an application filed as a division of the application upon which the first patent was issued, and this was done at the suggestion or requirement of the Patent Office. It was thought that it would be inequitable to reject the patent, since the plaintiff was led to adopt this course by the Patent Office itself. The effect of such a holding, however, would be to extend the patent for an additional period, since the issuing date of the first patent was July 27, 1926, while the second runs from September 4, 1928. The patentee was not obliged to accept the ruling of the Patent Office, and may not lengthen the term of his monopoly by the improper division of the patent which has resulted."

Tidewater cites *Remington* and *Century Electric* to argue that 323 is not invalid as double patenting merely because its claimed "composition of thioglycolic acid and ammonia falls within the scope of the 710 claims * * * and falls within the 323 claims that are specific to said composition * * *." But it is obvious that the two cases, quite contrary to Tidewater's construction, deposit the presence of double patenting on the presence of double claims for the same invention. None of the decisions cited by Tidewater controvert the proposition enunciated by Judge Soper. E. g.: Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 22 F.2d 259, 262 (2 Cir. 1927); Application of Heinle, 342

F.2d 1001 (CCPA 1965); Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 F. 712, 726–727 (6 Cir. 1897); Marks v. Polaroid Corp., 129 F.Supp. 243 (D. Mass.1955). Only Application of Sarett, 327 F.2d 1005, 1014 (CCPA 1964) might seem to lend support to Tidewater's argument. However, this decision, in turn, relies upon Stringham, Double Patenting, and in this same work we find the author approving this statement:

> " 'A patent for the genus always covers the species, and hence every subsequent inventor of a specific invention, though entitled to protection for what he has himself conceived, holds his exclusive privilege *subject to the general rights of the inventor of the generic invention'* ". (Accent added.) (page 209.)

Thus Stringham sustains our conclusion: that the species patent must fall if within the coverage of the genus patent.

 For these reasons we hold, contrary to the view of the master and the District Judge, that the six claims here of 323 are invalid as double patenting by their duplication of 710. Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894). The injury resulting is at once evident. Apart from subjecting the appellant-defendants to the damages ordered assessed, such repetitive patenting would extend the effectiveness of 710 from its expiry in December 1968 to 323's terminal date of February 1973. At the same time it would expose the public to double threat and hazard.

### Discovery or Invention not Proved

The invention attributed by the District Court to 323 was stated by the master to be "the discovery of the compositions of matter and methods of permanent waving of hair as specified in the six claims now remaining in this litigation."

But the record shows beyond dispute that these compositions were not a "discovery". As to T-acid, the following

colloquy between the Court and Tidewater's counsel demonstrates it:

> "The Court: It [thioglycolic acid] had been *known for nearly seventy years*. All right, now, the *mere fact of suggesting that thioglycolic acid will help in a permanent wave is not a patentable idea* in itself, is it, any more than suggesting that salt, which is a known chemical, might be used for a dozen uses? That is true, isn't it?
>
> "Mr. Finnegan: I think *that is right*, sir.
>
> "The Court: Now, don't we come down and don't we narrow the issue down to the proposition of using a certain solution within the limitations and purposes, that is the real test?
>
> "Mr. Finnegan: That is right, and that is what this patent is about. I would say this, that the invention concept has to start somewhere and the idea of using T-acid gives it the origin and it is the working together, working out of the combination that results in the invention that is claimed, working out these other limits." (Accent added.)

The ammonium hydroxide, ammonia gas dissolved in water, is primarily employed in the waving process to adjust the pH of the T-acid. It is utilized to control the pH of the solution by achieving the proper degree of alkalinity. Ammonia in solution is a common base and its instant use was described in the Maeder British patent, No. 435,213, of September 17, 1935. This was the observation of the Patent Office Examiner in his report on 323, mailed to counsel April 18, 1950.

That the use of these constituents did not represent the invention claimed—but that the proportions of their concentration which fixed the pH comprised the invention—is revealed by the following exchange between the Court and Tidewater's counsel:

> "The Court: So what it all adds up to is that with the three things that you put together to make the permanent wave solution—thioglycolic

acid, ammonia and water—that *it is the percentage, the quantitative grouping of these three that makes the patent.*

"Mr. Finnegan: *That is right.* The combination of certain percentages, certain pH gives the unique material." (Accent added.)

Thus the pH and the concentration of the solution, according to Tidewater below, constituted the sole features of the invention—these figures were critical. Parenthetically, one might note that the two are not independent phenomena. The concentration of the solution absolutely fixes the pH. This "criticality" was exclusively and successfully urged upon the Patent Office as the inventiveness in 323. Moreover, it was the ground on which Tidewater won the interference proceeding in this court, according to Judge Soper's opinion in Tidewater Patent Development Co. v. Gillette Co., supra, 4 Cir., 273 F.2d 936, 940. There the judge noted that "the pH rating * * * is confessedly the heart of the patent".

Notwithstanding, later in our case in the District Court, *Tidewater disavowed criticality* as the invention of 323. For instance, in its brief filed before the master in the District Court, Tidewater stated in black type:

"Since 323 is not a criticality invention, the 710 discussion of 'disclosure' of criticality is irrelevant."

Under this title line, Tidewater further stated:

"323 *does not posit* invention on criticality.

"Thus, criticality, the basis of invalidity in the 710 case * * * [is] irrelevant to any consideration of the 323 patent herein, except as a fifth string to its bow." (Accent in original.)

This position was reiterated several times thereafter in the brief.

Again, in answer to the Defendants' Memorandum in Lieu of Further Oral Argument on the Objections to the Master's Report, Tidewater stated:

"Plaintiff does not claim criticality in the technical, patent sense for these intermediate, *practical* values." (Accent in original.)

Tidewater would escape the bar of its disclaimer of criticality by urging that its arguments before the District Court are immaterial; that the letters patent speak conclusively, no matter the statements of the patentee or his counsel, citing Hutzler Bros. Co. v. Sales Affiliates, Inc., 164 F.2d 260, 267 (4 Cir. 1947); and Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., supra, 22 F.2d 259, 261 (2 Cir. 1927). Neither of these decisions, however, authorizes a litigant to give an assurance to the court and opposing counsel at trial and then reverse it on appeal.

■ Obviously, the purpose of the assurance here was to avoid the condemnation suffered by 710 and 323 in the New York cases on the ground of lack of criticality. In that litigation, where 323 was involved, Tidewater or its assignor, Tidewater's creator, also abandoned criticality as an invention of the patent—to escape the fate of 710—but then, contrary to its concession here, depended "upon the discovery of new and useful compositions of matter for permanent waving". Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., supra, 161 F.Supp. 345, 349. There is high authority for acceptance by a court in its decision of statements made by counsel to the court, even in the heat of argument; they are "impressive and significant". Minerals Separation, Ltd. v. Butte & Superior Mining Co., 250 U.S. 336, 352, 39 S.Ct. 496, 63 L.Ed. 1019 (1919). Tidewater cannot complain because we take it at its word.

The documentary proof of double patenting and the concessa negativing invention or discovery here override the statutory presumption of validity, 35 U.S.C. § 282, as well as "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed. 2d 545. On so concluding we have no

occasion to consider the charges of infringement.

■ Attorney fees in a reasonable amount should be awarded to the appellants as the prevailing parties. 35 U.S.C. § 285. The exceptional circumstances dictating this allowance are the fact that when it brought this suit Tidewater was aware of the obvious invalidity of 710 and 323, for it had been *conclusively* demonstrated by the Federal courts in New York. Whether or not Tidewater had the naked right to relitigate in this Circuit, we think to sue again in the circumstances was an abuse of that right, especially in seeking to recover on grounds renounced in New York and in the District Court here. Plymouth Rubber Co. v. Minnesota Mining & Mfg. Co., 203 F.Supp. 595, 601 (1962), affirmed and modified on other grounds, 321 F.2d 151 (1 Cir. 1963), cert. den. 375 U.S. 969, 84 S.Ct. 489, 11 L.Ed.2d 417 (1964). To leave the appellants or their indemnitors to bear the expense of defending Tidewater's accusations of infringement upon these facts would be to saddle them with an unjust hardship. On remand the District Court will fix the amount of such fees for attorneys' services in that Court as well as in this.

The judgment of the District Court must be reversed and the action remanded with directions to dismiss the action, awarding costs and counsel fees to the appellants.

Reversed and remanded.

### OPINION ON PETITION FOR REHEARING

In a petition for rehearing en banc, Tidewater attacks, especially, our award of counsel fees to appellants. Contrary to petitioner's assertion, the fees were asked by appellants; the court did not act ex mero motu. This allowance, we said, was based on the finding that the relitigation of patent 323 was, in the circumstances, an abuse of that right. We thought it vexatious. We still think so. If Tidewater wants to litigate and relitigate, it alone should pay the cost when it does not prevail.

Moreover, despite the protest of the petition we adhere to our view that in the District Court Tidewater did disavow criticality as an invention of 323 but claimed it on appeal. The statements of its position, as quoted in the opinion, clearly conceded below that Tidewater did not rely on criticality for the patent.

■ These two points of the petition are noted first because Tidewater's counsel reads our advertence to abuse, and to the subsequent change of position on criticality, as imputing unethical conduct to him. Abuse of a right may occur without connoting moral wrongdoing. That plainly was the sense in which "abuse" was employed here. Likewise, concessa made at trial by counsel may be interpreted by him in argument on appeal without suspicion of any attempt to renege. But the trial has to be reviewed on what appears of record, and the appeals court must objectively construe the concessions for their meaning. A construction contrary to the reading of them argued by counsel does not insinuate a distrust of him or a breach of ethics.

In neither instance did we impugn counsel's personal or professional character or intend to do so. No such opinion of him was expressed or implied.

Further in its petition Tidewater questions our statement that "the species patent must fall if within the coverage of the genus patent" and our quoting of *Stringham* in support. Bereft of its context the sentence might be subject to a valid attack. But, as is apparent from the opinion, and particularly from the lengthy quotation of Judge Soper therein, the word "coverage" is used to indicate what the genus patent *claims*, not what it "covers" in the Stringham usage.

In the interest of clarity, however, we withdraw from the opinion both the questioned statement and the citation of *Stringham*. The comment on Application of Sarett will remain; it is not contrary to the conclusions of our opinion. There, absence of double patenting was found because, unlike here, the claims involved in the two patents were separate and distinct. In this connection, we think

**1014**

the petitioner should be sustained in its attack on our inference of double patenting from Tidewater's concession "that any product made under 323 would infringe 710". This deduction may not in the circumstances be sound.

In all other respects the petition for rehearing is denied. An order will be entered modifying the original opinion as directed herein, but confirming the order of reversal heretofore entered, including the direction for allowance of costs and reasonable counsel fees to the appellants.